12 A.3d 1238

**Christian Darrell LEE**

v.

**STATE of Maryland.**

**No. 115, Sept. Term, 2009.**

Court of Appeals of Maryland.

Jan. 31, 2011.

138

Piedad Gomez, Asst. Public Defender (Elizabeth L. Julian, Acting Public Defender, Baltimore, MD), on brief, for petitioner.

Ryan R. Dietrich, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

BARBERA, J.

In its landmark decision, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that, before police interrogate a person in custody, the police must advise the person, inter alia, that any statement he or she makes "can and will be used against" him or her in court. We decide in this case whether, following the police officer's issuance of proper *Miranda* warnings and the suspect's knowing, intelligent and voluntary waiver of the rights afforded by *Miranda*, the officer subverted the warnings and waiver by later stating that the interrogation is "between you and me, bud." For the reasons that follow, we hold that the officer's statement subverted the warnings and waiver, rendering in violation of *Miranda* all statements the suspect thereafter made during that interrogation.

I.

The issue we address grew out of an incident on September 8, 2006, in which Eric Fountain was fatally shot in his Dun-

dalk, Maryland home, and Randy Hudson, the father of Mr. Fountain's granddaughter, was assaulted and, allegedly, robbed. Two days later, an informant contacted the Baltimore County Police Department regarding the incident and provided information from which the police developed three suspects: Petitioner Christian Darrell Lee; his cousin, Darnell Smith; and John Satterfield. The police later arrested and charged Petitioner for crimes connected to the events of the night in question. Petitioner filed a pre-trial motion to suppress certain statements he made during a police interrogation. The following facts were developed at the hearing on the motion.

The police arrested Petitioner at 5:30 a.m. on September 9, 2006, and transported him to police headquarters. Detective Craig Schrott of the Homicide Unit began the interrogation of Petitioner at approximately 12:38 p.m. The interview was recorded by a camera hidden in the room.

Detective Schrott began the recorded interview by obtaining from Petitioner certain biographical information. Detective Schrott then said he wanted to interview Petitioner about "a robbery that was down at Dundalk for a guy that was beat up in a back yard, and there was a man that was killed up in his bedroom." Detective Schrott had Petitioner read aloud the *Miranda* warnings, including that "anything you say can and will be used against you in a court of law." Detective Schrott confirmed with Petitioner that he understood each advisement, as. it was read, and that he understood that he was not required to answer the questions and could stop the interview at any time. Petitioner then signed a written waiver of the *Miranda* rights.

Detective Schrott asked Petitioner if he knew about the incident in Dundalk. Petitioner acknowledged that he knew, because he was present at the scene at the time of the incident. Petitioner explained that, on the night in question, "John" and Petitioner's cousin, "Darnell," accompanied by two girls, picked him up from his home. Together they traveled by car to Dundalk, ending up in a park to "have a few drinks."

John went into a nearby alley to move the car and there got into a fight with a man. Petitioner and Darnell walked over to the scene of the fight but, according to Petitioner, he left the group because John could "handle himself." Eventually, John, Darnell, and the man who had been in the fight with John went into a house. The house to which Petitioner referred was the Fountain residence.[1]

Petitioner acknowledged following the men into the Fountain residence. Petitioner stated at that point in the interrogation that he left the house because he was scared and waited outside for the others, and he did not know what had occurred in the house. Detective Schrott told Petitioner that he had spoken with the others involved, and he knew that Petitioner had been in the house with Darnell. Petitioner then acknowledged that he had gone into the house and up to the second floor with Darnell, where he saw a "guy that was shot." Petitioner added, though, that he was not present when the shooting took place, he did not hear a shot, and he did not know who shot the man.

Detective Schrott continued to press Petitioner for an explanation of the shooting which, about an hour into the interrogation, led to the following exchange between the two:

Q. The man, where was he at? Was he still in, was he still in bed; was he standing up? I mean, it's important to tell me what his demeanor is? Tell me what he's, he's saying, or what he's doing, all right, so I can get a better picture of what's going on, what you're going through. When the two of you go upstairs, all right, and, is he, is he in the bedroom? Is he—

A. (Witness nodding head yes.)

Q.—is he standing up, or was he still in bed? Was he sleeping? Was he awake? Chris, bud—all right. Was he still in bed or did he get up?

A. I'm going to jail, right?

---

1. Later, at trial, evidence disclosed that the man assaulted in the alley was Randy Hudson.

**144**

Q. We're not talking about jail right now.

A. Just—that's what the whole thing is about.

Q. That ain't what it's about. It's about getting to what the truth is, that's what it's all about.

Now, was he still in bed, or did he get out of bed while your cousin was up there?

A. He was still in bed.

Q. And once you two got upstairs what happened?

A. We was told money was under the bed.

Q. Was under the bed. Now who told you that?

A. Chuck told me—John.

Q. Who told that (sic) you?

A. John. Guess he got out of—

Q. John told you that. So—all right, sir—so when you got there, you went into that room, was that man awake; was he asleep?

A. He was asleep.

Q. He was asleep?

**A. Yeah, this is being recorded.**

**Q. This is between you and me, bud. Only me and you are here, all right? All right?**

A. I'm trying to put together fact and accept that my life is basically over.

(Emphases added.)

Not long after that exchange, Petitioner admitted for the first time during the interrogation that he shot Eric Fountain:

Q. Are you guys—do you wake him up, or does your cousin wake him up looking for the money, or do you try to find the money without waking him up?

A. First we look under the bed. He, he woke up when my cousin left, then he tried to rush me. He got too close. I tried to run. I didn't see, I didn't see why. I tried to get him away from me so I could leave.

Q. So you were trying to get away?

A. **I, I thought, I thought a gunshot would scare him. I ain't know I hit him. I wasn't even looking.**

Q. How'd you shoot when you were running? I mean, did you shoot like over your shoulder?

A. **No. Like, like this (Indicating). 'Cause I was close, near the door, and he, he just kept coming. I shot two immediate times. It's not like I shot, went away, shot here. I shot two immediate times.**

(Emphases added.)

Petitioner followed those admissions with a more complete description of what occurred before and during the shooting. He described further details about the fight in the alley; he stated for the first time that he was involved in assaulting Randy Hudson, whom he now identified as "Scooby"; and he provided additional details about what occurred in the house. Petitioner stated, among other things, that he learned while upstairs that there was to be a robbery of $100,000, which was supposed to be under the mattress in the bedroom. Petitioner said that Darnell yelled, woke up the victim, and stated there was money under the bed, which the victim denied. Petitioner stated that Darnell then "[g]ave me the gun and I was supposed to watch him. He, he try [to] wrestle him, and I tried [to] run. Shot twice." Petitioner, Darnell, and John ran from the house, got in a car, and left the scene. The interrogation concluded at approximately 2:10 p.m.[2]

The video recording of the interrogation was admitted into evidence at the suppression hearing and played for the court. Defense counsel raised a number of arguments in support of suppression of all or part of Petitioner's statements during the interrogation. Pertinent here, the defense argued that Detective Schrott's advising Petitioner during the interrogation, "This is between you and me, bud. Only me and you are here, all right? All right?", vitiated Petitioner's prior waiver of his

---

**2.** The record of the suppression hearing reflects that, shortly after that first interrogation, there was a second one. The prosecutor informed the suppression court that the State would not be seeking to admit any part of that second interrogation.

*Miranda* rights by effectively undermining the warning that anything he said during the interrogation would be used against him in court. Counsel argued that the *Miranda* violation compelled suppression of everything Petitioner thereafter said to Detective Schrott. Counsel also argued that Petitioner's statements following Detective Schrott's comment were involuntary under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Article 22 of the Maryland Declaration of Rights, and Maryland common law.

The court denied the motion on all grounds. With respect to whether Petitioner's prior waiver was vitiated by Detective Schrott's statement that the conversation was "between you and me, bud," the court ruled:

And, finally, I think it's a close case. I think that the State has made a good argument that [Petitioner's] demeanor does not change from the beginning of the interview throughout the end of it, as he does get more emotional at times. But his way of responding to the questions doesn't change in any material respect, and he appears to know that he is being recorded. The statement he makes is, this is being recorded, ain't it? The Detective does not directly answer that question by saying yes or no, but he certainly leaves the Defendant to believe that the conversation is just between the two of them, which was not true. But I do not think that the, it changed the Defendant's willingness to answer the questions in any way. Or violated his rights.

Petitioner was tried before a jury on charges of first degree murder of Eric Fountain, robbery and assault of Randy Hudson, robbery and assault of Anna Hudson (Eric Fountain's wife, who was present in the house on the night in question), first degree burglary, and related handgun offenses. The State made use of Petitioner's statement during its case in chief.

During its deliberations, the jury submitted to the court a written note which read, "1. In the case of felony murder anyone present is as guilty as the person who personally

commits the murder. 2. In the case of felony robbery does the same hold true?" The court responded to the note by writing: "The answer to this question is contained in the Jury Instructions provided to you." Defense counsel objected to the court's response: "I thought that as to this, the Court should indicate that the first sentence [of the jury's note] is inaccurate.... I am objecting to that not being included within the instructions." The jury found Petitioner guilty of felony murder of Eric Fountain, first degree burglary, first degree assault of Randy Hudson and Anna Fountain, and related handgun offenses.

On appeal to the Court of Special Appeals, Lee argued, among other claims of error, that the court erred in denying the motion to suppress his statements to Detective Schrott following the comment, "This is between you and me, bud," and in its response to the jury note. In a reported opinion, the Court of Special Appeals affirmed the judgments of conviction. *Lee v. State*, 186 Md.App. 631, 975 A.2d 240 (2009).

The Court of Special Appeals held that, considered in context, Schrott's statement, "This is between you and me," was not a promise of confidentiality that undermined the *Miranda* warnings and waiver, and it did not render Petitioner's subsequent statements involuntary, under either the federal or state constitutions or Maryland common law. *Id.* at 657–58, 975 A.2d at 255. The court further held that the trial court's response to the jury question, referring the jury to the instructions previously given, was sufficient because the initial instructions "made clear" the answer. *Id.* at 665–66, 975 A.2d at 260.

Petitioner filed a petition for writ of certiorari, which we granted, *Lee v. State*, 411 Md. 355, 983 A.2d 431 (2009), to answer the following questions:

1. Whether the interrogating officer made a promise of confidentiality, violated the protections of *Miranda v. Arizona*,[ ] and induced an involuntary statement when, an hour into an interrogation in which Petitioner continually denied involvement in the shooting, the officer stated: "This is

between you and me, bud. Only you and me here, all right? All right?"

2. Whether where the deliberating jury asked, "In the case of felony murder anyone present is as guilty as the person who personally commits the murder. In the case of felony robbery, does the same hold true," the trial court erred in merely responding, "[t]he answer to this question is contained in the jury instructions provided to you"?

For the reasons that follow, we agree with Petitioner that everything he said following Detective Schrott's comment, "This is between you and me, bud," undermined the prior *Miranda* warnings, and therefore everything Petitioner said during the remainder of the interrogation was obtained in violation of *Miranda*. We do not agree, though, that the detective's statements rendered Petitioner's subsequent confession involuntary under either federal and state constitutional principles or Maryland common law. Because Petitioner is entitled to a new trial on the ground that the State made substantive use at trial of the statements that were the product of the *Miranda* violation, we have no need to, and thus do not, decide the second question he presents.

## II.

In undertaking our review of the suppression court's ruling, we confine ourselves to what occurred at the suppression hearing. *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129, 1135 (2007). " '[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion,' " here, the State. *Owens v. State*, 399 Md. 388, 403, 924 A.2d 1072, 1080 (2007) (quoting *State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439, 444 (2003)), *cert. denied*, 552 U.S. 1144, 128 S.Ct. 1064, 169 L.Ed.2d 813 (2008). "We defer to the motions court's factual findings and uphold them unless they are shown to be clearly erroneous." *State v. Luckett*, 413 Md. 360, 375 n. 3, 993 A.2d 25, 33 n. 3 (2010). "We, however, make our own independent constitutional appraisal, by reviewing the relevant

law and applying it to the facts and circumstances of this case." *Id.*, 993 A.2d at 33 n. 3 (quotation marks and citation omitted).

### III.

■■■ The *Miranda* decision is grounded in that portion of the Fifth Amendment to the United States Constitution that provides: "No person . . . shall be compelled in any criminal case to be a witness against himself," U.S. CONST. amend. V.[3] One of the Court's stated aims in establishing the *Miranda* rule is to "assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." *Miranda*, 384 U.S. at 469, 86 S.Ct. 1602.

■■■ The *Miranda* Court put into place " 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.' " *Florida v. Powell*, 559 U.S. ——, ——, 130 S.Ct. 1195, 1203, 175 L.Ed.2d 1009 (2010) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 201, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989)). Specifically, police must warn a suspect that

> he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479, 86 S.Ct. 1602.

The *Miranda* Court explained the importance of the warning concerning the use of the individual's statements in court. That warning is needed in order to make the individual

> aware not only of the privilege [against compelled self-incrimination], but also of the consequences of foregoing it. It is only through an awareness of these consequences that

---

**3.** The Fifth Amendment applies to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 7, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that is he is not in the presence of persons acting solely in his interest.

*Id.*

■ The rights expressed in the *Miranda* warning pertain throughout the interrogation. *See Berghuis v. Thompkins,* 560 U.S. ——, ——, 130 S.Ct. 2250, 2263–64, 176 L.Ed.2d 1098 (2010) ("If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease."); *see also Miranda,* 384 U.S. at 473–74, 86 S.Ct. 1602 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.... If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.").

■ Inquiry into the adequacy of the waiver of the *Miranda* rights "has two distinct dimensions":

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if "the totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (citations omitted).

The *Miranda* Court recognized that a waiver of the rights afforded by the warnings can be undermined by words or actions on the part of the police. If the evidence shows "that the accused was threatened, tricked, or cajoled into a waiver," then that "will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda,* 384 U.S. at 476, 86

S.Ct. 1602. *See Colorado v. Spring,* 479 U.S. 564, 576 n. 8, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (noting that the Court "has found affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege" (citation omitted)); *accord United States v. Anderson,* 929 F.2d 96, 100–01 (2d Cir.1991) (affirmative misrepresentations by the police may be sufficiently coercive to invalidate a suspect's waiver of the Fifth Amendment privilege); 2 WAYNE R. LAFAVE, JEROLD H. ISRAEL & NANCY J. KING, CRIMINAL PROCEDURE § 6.9(c) (stating that, in contrast to traditional voluntariness, "there is an absolute prohibition upon any trickery that misleads the suspect as to the existence or dimensions of any of the applicable [*Miranda*] rights").

■ The Supreme Court has clarified, moreover, that the motive underlying the interrogator's conduct, whether intentional or inadvertent, is in itself irrelevant when evaluating "the intelligence and voluntariness of [the suspect's] election to abandon his rights" under *Miranda. Burbine,* 475 U.S. at 423, 106 S.Ct. 1135. Rather, "such conduct" by the police "is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Id.* at 424, 106 S.Ct. 1135. Similarly, when examining an officer's statements to a suspect regarding his or her *Miranda* rights, courts look only at the words the officer used and "will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given," because such an inquiry "can never be more than speculation...." *See Miranda,* 384 U.S. at 469–70, 86 S.Ct. 1602.

■ Since *Miranda* was decided, courts have applied the principles of that case and its progeny to hold that, after proper warnings and a knowing, intelligent, and voluntary waiver, the interrogator may not say or do something during the ensuing interrogation that subverts those warnings and thereby vitiates the suspect's earlier waiver by rendering it unknowing, involuntary, or both. Such action on the part of

the police violates *Miranda* and, as a consequence, requires suppression of any statements the suspect makes thereafter during the interrogation.

One such case is *Hopkins v. Cockrell,* 325 F.3d 579 (5th Cir.2003). The United States Court of Appeals for the Fifth Circuit concluded that a police officer made an improper assurance of confidentiality when, after proper warnings and waiver, he told Hopkins: "This is for me and you. This is for me. Okay. This ain't for nobody else." *Id.* at 584. The court cited *Miranda* for the proposition that " '[a]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege.' " *Id.* at 584 (quoting *Miranda,* 384 U.S. at 476, 86 S.Ct. 1602). The Court then had this to say about the interrogating officer's assurance of confidentiality: "An officer cannot read the defendant his *Miranda* warnings and then turn around and tell him that despite those warnings, what the defendant tells the officer will be confidential and still use the resultant confession against the defendant. Yet Knott [the interrogating officer] and the prosecution did exactly that." *Id.* at 585. The *Hopkins* court concluded that the officer's statement violated *Miranda,* which, together with other circumstances surrounding the interrogation, also rendered Hopkins's confession involuntary under the dictates of *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).[4] *Hopkins,* 325 F.3d at 584.

The Supreme Court of Georgia applied the *Hopkins* court's *Miranda* analysis to its decision in *Spence v. State,* 281 Ga. 697, 642 S.E.2d 856 (2007). In that case, Spence, arrested for rape, was interrogated about a murder unrelated to the arrest. The *Spence* court described what happened: "During the interrogation, Spence was read his *Miranda* rights, which he

---

4. *Spano,* which the Court decided seven years before *Miranda,* was based on Fourteenth Amendment voluntariness grounds. *See* 360 U.S. at 320–21, 79 S.Ct. 1202. The *Hopkins* court ultimately held that the constitutional error in allowing use at trial of Hopkins's involuntary statements was harmless "[i]n light of the overwhelming amount of circumstantial evidence present in this case[.]" 325 F.3d at 585.

signed. In the first hour of interrogation, Spence said nothing to implicate himself. Spence then broke down in tears and asked if he could talk to his girlfriend." *Id.* at 698, 642 S.E.2d at 857. There was then an exchange between Spence and the interrogating officer, during which the officer told Spence "Just you and me, just you and me." Spence said: "I'm just scared when I go to jail, everybody gonna know that I said something." To that the officer responded, "Lem, ain't nobody saying nothing, this is confidential." *Id.,* 642 S.E.2d at 857. Shortly thereafter, the officer repeated that "nobody knows what you're there for," because "[t]his is confidential what we're doing right here. Do you understand that? This is confidential...." *Id.,* 642 S.E.2d at 857. The officer then implored Spence to tell him "what happened." After that, Spence "gave a statement incriminating himself in the murder." *Id.,* 642 S.E.2d at 857. The *Spence* Court held:

> [I]t would have been reasonable for Spence to understand Quinn's [the officer's] statement that their interview was confidential as an unqualified statement that what Spence told Quinn would be kept confidential between the two of them, and would not be disclosed to anyone else. Accordingly, we conclude that the trial court erred in ruling that Spence's statement to Quinn was admissible.

*Id.* at 700, 642 S.E.2d at 858. The court did not state the legal ground for its holding. The court stated, though, that its decision was controlled by *Hopkins,* referring specifically to the *Hopkins* court's declaration that " 'An officer cannot read the defendant his *Miranda* warnings and then turn around and tell him that despite those warnings, what the defendant tells the officer will be confidential and still use the resultant confession against the defendant.' " *Id.* at 699, 642 S.E.2d at 858 (quoting *Hopkins,* 325 F.3d at 585).

The *Spence* court also found controlling its earlier decision, *Foster v. State,* which involved an officer repeatedly telling the defendant that the recording of his previous, unrecorded confession "was not going to hurt 'a thing' and that it would be 'as much for your benefit as ours.' " 258 Ga. 736, 742, 374 S.E.2d 188, 194 (1988). The Georgia Supreme Court repeated

what it had held in *Foster:* " 'An accused must be warned that anything he says can and will be used against him in court. Telling him that a confession is not going to hurt and, on the contrary, will benefit him as much as the police, is not consistent with the warnings required by *Miranda.'* " 281 Ga. at 699, 642 S.E.2d at 858 (quoting *Foster,* 258 Ga. at 742, 374 S.E.2d at 194). Although the *Spence* court did not say so expressly, the rationale for its holding is plain: Spence's incriminating statement to the police was inadmissible at his trial because, notwithstanding earlier warnings and waiver, his subsequent confession violated *Miranda* in that the officer's statement of confidentiality subverted the earlier warnings and waiver.

Similar to the above cases is *State v. Pillar,* 359 N.J.Super. 249, 820 A.2d 1 (N.J.Super.App.Div.2003). In *Pillar,* the defendant, after receiving proper *Miranda* warnings and making a knowing and voluntary *Miranda* waiver, was asked by the police if he wished to speak. He responded that he was "guilty of some of the things on [a statement of charges that he had been given to read] . . . but not all of them." *Id.* at 262, 820 A.2d at 11. The defendant said that he wanted to speak to a lawyer first, and he asked what would happen next. He was told about the arraignment process, setting of bail, and appointment of counsel if necessary. The defendant then asked to say "something off-the-record." *Id.* at 262, 820 A.2d at 11. The police agreed, and the defendant then made an incriminating statement. The New Jersey court held that the police officers violated *Miranda* by agreeing to receive the defendant's off-the-record statement. *Id.* at 268, 820 A.2d at 21–22. The court explained why:

> A police officer cannot directly contradict, out of one side of his mouth, the *Miranda* warnings just given out of the other. An acquiescence to hear an "off-the-record" statement from a suspect, which the officer ought to know cannot be "off-the-record," totally undermines and eviscerates the *Miranda* warnings, at least with respect to a statement

made, as here, in immediate and direct response to the misleading assurance.

*Id.* at 268, 820 A.2d at 11–12.

The California Supreme Court held to like effect in *People v. Braeseke*, 25 Cal.3d 691, 159 Cal.Rptr. 684, 602 P.2d 384 (1979). The *Braeseke* court held that the police violated *Miranda* when, following *Miranda* warnings and waiver, they obtained a statement that the defendant requested be made to one officer only and "off-the-record"; the police agreed to that procedure without explaining that there was no such thing, in the interrogation context, as "off-the-record." *Id.* at 701, 159 Cal.Rptr. 684, 602 P.2d at 390. The court held that a request to speak off-the-record cannot constitute a knowing and intelligent waiver of *Miranda* rights, specifically with respect to the advice that anything a suspect says can be used against the suspect in a court of law. *Braeseke*, 25 Cal.3d at 702, 159 Cal.Rptr. 684, 602 P.2d at 391. In so holding, the court observed: "Indeed, defendant's request revealed a marked lack of understanding of the *Miranda* warnings. [The police] then contributed to defendant's lack of understanding by agreeing to the request rather than informing defendant that there could be no such thing as an off the record discussion." *Id.* at 702–03, 159 Cal.Rptr. 684, 602 P.2d at 391. *See also State v. Stanga*, 617 N.W.2d 486, 491 (S.D.2000) (holding that multiple statements made by an interrogating officer to the defendant that "I'm here for you and I to talk" "nullified" earlier *Miranda* warnings).[5]

---

**5.** The Court of Special Appeals points out that some courts see a distinction between misrepresentations by the police, concerning the scope of *Miranda's* protections, that occur before a *Miranda* waiver and those that occur later in the interrogation. *Lee v. State*, 186 Md.App. at 650–51, 975 A.2d at 251 (citing *United States v. Bezanson–Perkins*, 390 F.3d 34, 41 (1st Cir.2004) (questioning whether police misstatements after a voluntary waiver could invalidate the waiver); *United States v. Chadwick*, 999 F.2d 1282, 1286 (8th Cir.1993) (detective's statement that the defendant's cooperation would "help" him did not invalidate Chadwick's waiver of his *Miranda* rights; it could not have had any impact on Chadwick's decision to waive his *Miranda* rights, since the waiver had occurred earlier)). We agree with our colleagues on the Court of Special Appeals that the timing of the police deception is not

The rationale underlying the decisions in the cases we have discussed applies with equal force to the present case. As in all of those cases, Petitioner was properly advised of the *Miranda* rights, which included the advisement that "anything you say can and will be used against you in a court of law." As in those cases, Petitioner, at the time of those advisements, voluntarily and knowingly waived *Miranda* and agreed to talk. And, much as in those cases, Petitioner was later told something by the officer that subverted the advisement that anything he said during the interrogation could and would be used against him in court.

 Detective Schrott's words, "This is between you and me, bud. Only me and you are here, all right? All right?," on their face imply confidentiality and thereby directly contradict the advisement that "anything you say can and will be used against you in a court of law." Moreover, even if we were to assume that Detective Schrott did not intend his words to imply a promise of confidentiality (an assumption about which we have serious doubt), our focus is not on what the detective intended, but rather on what a layperson in Petitioner's position would have understood those words to mean. *See Burbine*, 475 U.S. at 423–24, 106 S.Ct. 1135. No reasonable lay person would have understood those words to mean anything other than that the conversation, at that moment and thereafter, even if not before, was "between" only Detective Schrott and Petitioner.

The State argues that Detective Schrott's assertion amounted to something less than an assurance of confidentiality because it was offered in response to Petitioner's uttering, "this is being recorded." The State, however, ignores the conspicuous implication of the phrase Schrott used. Intentionally or not, the detective's utterance, "this is between you and me, bud," communicated more than a mere "yes" or "no"

dispositive and we explain, *infra*, why, to the extent those courts hold that a suspect is not entitled to suppression of statements he or she makes following a mid-interrogation, affirmative misrepresentation of the *Miranda* warnings, those courts, in our view, are incorrect.

reply to a query about the presence of a recording device. Indeed, in line with our interpretation here, the Circuit Court found that Schrott's statement "leaves the Defendant to believe that the conversation is just between the two of them...." It is of no consequence that Detective Schrott committed the *Miranda* violation only once, rather than multiple times as in some of the cases we have discussed. The violation, once committed, was enough to undermine the warning that anything Petitioner said to the detective could and would be used against him in court. In this regard we grant the officer no greater leave than we would had he made the error while advising Petitioner in the first instance. *See Luckett,* 413 Md. at 384, 993 A.2d at 38–39 (holding that the officer's warnings, which included both correct and incorrect statements concerning the scope of the *Miranda* protections, fell far short of properly advising the defendant of his rights under *Miranda* ).

We hold that Detective Schrott's affirmative misrepresentation mid-way through the interrogation that Petitioner's statements were "just between you and me, bud. Only you and me are in here," rendered Petitioner's prior *Miranda* waiver ineffective for all purposes, going forward. We disagree with the Court of Special Appeals that the detective's words did not misrepresent the *Miranda* warnings. The detective's words were nothing less than a promise of confidentiality, even though not couched in precisely those terms. The *Miranda* violation, moreover, lay in the officer's words themselves. We therefore do not undertake to examine further whether Petitioner subjectively relied on them to his detriment. To hold otherwise would violate the very foundation upon which *Miranda* is based.

### IV.

Because the State made substantive use of the statements of Petitioner that were taken in violation of *Miranda,* he is entitled to a new trial. *See Harris v. New York,* 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (statements taken in violation of *Miranda* may not be used by the

prosecution in its case in chief, but may be admitted for impeachment purposes); *accord Oregon v. Hass,* 420 U.S. 714, 721–22, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). We nonetheless must also address Petitioner's arguments that those same statements were involuntary under the Due Process Clause of the Fourteenth Amendment and Article 22 of the Maryland Declaration of Rights, as well as Maryland common law. We must do so because, if we were to find the statements involuntary on any of those grounds, then the State is precluded from using Petitioner's statements for any purpose, including impeachment. *See Mincey v. Arizona,* 437 U.S. 385, 397–98, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (any criminal trial use of a defendant's statement which was involuntary under the federal constitution is prohibited); *Hof v. State,* 337 Md. 581, 599–600, 655 A.2d 370, 379 (1995) (a statement is inadmissible in the State's case in chief and for impeachment purposes if it is involuntary under Maryland common law). It is to that task that we turn next.

## V.

Petitioner devotes very little space in his brief to the constitutional voluntariness arguments, and only a bit more to his argument concerning common law voluntariness. We, too, need not devote much attention to either of these contentions, as neither entitles Petitioner to relief.

We begin with the well-recognized proposition that only voluntary confessions are admissible as evidence against a criminal defendant. *Knight v. State,* 381 Md. 517, 531, 850 A.2d 1179, 1187 (2004). To be voluntary, a confession must satisfy federal and state constitutional strictures as well as the Maryland common law rule that a confession is involuntary if it is the product of an improper threat, promise, or inducement by the police. *Id.* at 532, 850 A.2d at 1187–88.

## A.

We begin our analysis with the test for voluntariness under federal and state constitutional law. We have held the

due process protections inherent in Article 22 are construed *in pari materia* with those afforded by the Fourteenth Amendment, *see Choi v. State*, 316 Md. 529, 535 n. 3, 560 A.2d 1108 n. 3 (1989), so what we say about the latter controls, for both the federal and state constitutional arguments Petitioner makes.

The Supreme Court has established a test for voluntariness that prohibits confessions that are the result of police conduct that overbears the will of the suspect and induces the suspect to confess. *See Arizona v. Fulminante*, 499 U.S. 279, 288, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (declaring that a credible threat of physical violence can render a subsequent confession involuntary); *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"); *see also Spano*, 360 U.S. at 323, 79 S.Ct. 1202 (concluding "that petitioner's will was overborne by official pressure, fatigue and sympathy falsely aroused, after considering all the facts in their post-indictment setting").

 Not every deceptive practice by the police meets this standard. *Ball v. State*, 347 Md. 156, 178–79, 699 A.2d 1170, 1180 (1997), *cert. denied*, 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998). Lying to the suspect about the strength of the evidence against the defendant and showing false sympathy for the suspect, for example, do not rise to the level of the type of police coercion that is viewed as overbearing the will of the suspect. Indeed it is the rare and extreme case in which a court will find that a suspect confessed involuntarily. *See, e.g., United States v. Rutledge*, 900 F.2d 1127, 1129 (7th Cir.1990) (commenting that "very few incriminating statements, custodial or otherwise, are held to be involuntary").

We emphasized the point in *Reynolds v. State*, 327 Md. 494, 610 A.2d 782 (1992), *cert. denied*, 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993). In *Reynolds* we noted, 327 Md. at 505, 610 A.2d at 787, that the Supreme Court in *Fulminante*

"made it clear that constitutional voluntariness does not require that all promises, threats, or inducements render a confession involuntary; instead, the federal constitution requires only that courts consider promises, threats, or inducements as part of the totality of the circumstances that courts must look at to determine voluntariness." *See Fulminante,* 499 U.S. at 285–86, 111 S.Ct. 1246 (stating that the *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897) standard of condemning any confession obtained by "any direct or implied promises, however slight, [or] by the exertion of any improper influence," has been replaced by a "totality of the circumstances" test).

Petitioner grounds his constitutional voluntariness argument solely on Detective Schrott's assurance of confidentiality, which, Petitioner asserts, "misled [him] as to his constitutionally protected right against self-incrimination." Petitioner points to the fact that, before the detective's improper statement, Petitioner denied involvement in the crimes, and only after the detective's statement did he make a full confession. We are not persuaded by Petitioner's argument.

■ To be sure, the State has the burden to prove voluntariness. *State v. Tolbert,* 381 Md. 539, 558, 850 A.2d 1192, 1202 (2004). We cannot help but note, nonetheless, that Petitioner did not testify at the suppression hearing. Therefore, we do not have even his word that Detective's Schrott improper comment overbore his will and produced his confession. Nor does the fact that Petitioner's confession followed the detective's comment, by itself, establish that Petitioner's will was overborne. As we have said, a mere promise, whether it be of leniency or, as here, confidentiality, without more, will not render a confession involuntary, for federal (or state) constitutional purposes. We therefore hold that Petitioner's confession, made after the improper promise of confidentiality, did not violate the Due Process Clause of the Fourteenth Amendment, and, for the same reason, did not violate Article 22 of the Maryland Declaration of Rights.

## B.

We likewise reject Petitioner's common law voluntariness argument. Under Maryland common law, a confession is involuntary if it is the product of certain improper threats, promises, or inducements by the police. *See Knight*, 381 Md. at 532, 850 A.2d at 1187–88. The test for common law voluntariness was set forth in *Hillard v. State*, 286 Md. 145, 406 A.2d 415 (1979). Under that test, an inculpatory statement is involuntary under Maryland common law if (1) any officer or agent of the police promises or implies to the suspect that he will be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and (2) the suspect makes a confession in apparent reliance on the police officer's explicit or implicit inducement. *Id.* at 153, 406 A.2d at 420. "Both prongs [of the *Hillard* test] must be satisfied before a confession is deemed to be involuntary." *Winder v. State*, 362 Md. 275, 310, 765 A.2d 97, 116 (2001). The sort of promise or inducement to which the *Hillard* test applies, however, has been limited to leniency before, during, or after trial. *See Hill v. State*, 418 Md. 62, 75–77, 12 A.3d 1193, 1201 (2011) (collecting cases).

As with constitutional voluntariness, the State has the burden to prove that Petitioner's confession, following Detective Schrott's improper remark, was voluntary under this common law standard. *See Knight*, 381 Md. at 532, 850 A.2d at 1190. We are convinced that it was. The promise here was of confidentiality, not leniency, as in those cases in which we heretofore have found a common law violation. *See, e.g., Hill*, 418 Md. at 80–81, 82, 12 A.3d at 1204, 1205 (holding that a statement to a suspect by an interrogating officer that the victim and the victim's family "did not want to see [the suspect] get into trouble, but they only wanted an apology" for what happened, is an improper inducement); *Knight*, 381 Md. at 536, 850 A.2d at 1188 (concluding that the interrogator's alleged "promise" to the defendant that he would inform the prosecutor of how the interrogation went, including whether

he cooperated, was not an improper inducement to confess; also concluding that an interrogator's statement that the defendant's cooperation would be "helpful" was not an improper inducement, but that the statement, "If down the line, after this case comes to an end, we'll see what the State's Attorney can do for you, with your case, with your charges," was "clearly a promise to exercise advocacy on the defendant's behalf"); *Winder,* 362 Md. at 289, 765 A.2d at 104 ("I can make you a promise, Okay? I can help you. I could try to protect you" held to be an improper inducement); *Hillard,* 286 Md. at 153, 406 A.2d at 420 ("[I]f you are telling me the truth … I will go to bat for you" held to be an improper inducement); *Streams v. State,* 238 Md. 278, 281, 208 A.2d 614, 615 (1965) ("[I]t would be better for [you] if [you] made a statement because if [you] did they would try to get [you] put on probation" held to be an improper inducement).

Petitioner does not cite any Maryland cases holding that a promise of confidentiality, like the one Detective Schrott made during the interrogation, renders a subsequent confession involuntary under Maryland common law. Petitioner simply asks us to hold as much. Given that he offers little to persuade us that, on the facts of this case, we should do so, we decline at this time to expand the rule of common law voluntariness to cover situations like the one presented here.

## VI.

We hold that the statement by Detective Schrott that "this is just between you and me, bud" was effectively a promise of confidentiality that directly contradicted the early *Miranda* advisement that "anything you say can and will be used against you in a court of law," thereby vitiating Petitioner's prior waiver, and rendering in violation of *Miranda* everything that Petitioner said to the detective during the remainder of the interrogation. The detective's statement, however, did not render Petitioner's statements involuntary under either federal or state constitutional law, or Maryland common law.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND REMAND FOR A NEW TRIAL; COSTS TO BE PAID BY BALTIMORE COUNTY.

BELL, C.J., and MURPHY, J., Concur and Dissent.

MURPHY, J., concurring and dissenting, in which BELL, C.J. joins.

I agree that the Petitioner is entitled to a new trial. I dissent, however, from the majority's conclusion that the detective's improper promise of confidentiality "did not render Petitioner's statements involuntary under either federal or state constitutional law, or Maryland common law." In my opinion, an incriminating statement that results from a promise of *confidentiality* is simply not the product of a "knowing and intelligent" waiver.[1] I would therefore hold that, on remand, the State is prohibited from making any use—direct or derivative—of anything that Petitioner stated after being told, "this is just between you and me[.]"

Chief Judge BELL has authorized me to state that he joins in this concurring and dissenting opinion.

---

1. My opinion is consistent with *State v. Carroll*, 138 N.H. 687, 645 A.2d 82, 85 (1994), *State v. Stanga*, 617 N.W.2d 486, 490–91 (S.D.2000), and *United States v. Conley*, 859 F.Supp. 830, 845–46 (W.D.Pa.1994), which are cited in Andrew V. Jezic, Frank Molony & William E. Nolan, *Maryland Law of Confessions* § 3:12 at 93 (2006), as well as with *State v. Burr*, 126 Ariz. 338, 615 P.2d 635, 637 (1980); *State v. Tamerius*, 234 Neb. 121, 449 N.W.2d 535, 537 (1989); *United States v. Walton*, 10 F.3d 1024, 1031 (3d Cir.1993); *State v. McConkie*, 755 A.2d 1075, 1077–79 (Me.2000); *State v. Pillar*, 359 N.J.Super. 249, 820 A.2d 1, 11–12 (2003); *Jones v. State*, 65 P.3d 903, 907–08 (Alaska App.2003); and *State v. Parker*, 160 N.H. 203, 999 A.2d 314, 320 (2010).