Dissenting Opinion by
Barbera, C.J.,
which McDonald, J,, joins
I respectfully dissent. The Court was presented in this case with another opportunity to apply the principles first set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and developed in the decades since that landmark decision was issued. The Majority concludes that Brown was in custody for Miranda purposes. In reaching that conclusion, the Majority relies on the following facts: Brown was taken to the hospital for treatment of multiple gunshot wounds; Detective Howard came to the hospital and advised Brown that he was there to “obtain” him; Detective Howard arrived at the hospital to collect Brown at approximately 6:40 a.m.; Detective Howard transported Brown directly from the hospital in hospital garb with his head still bandaged; Brown was transported in the rear seat of a marked police cruiser; Brown was told that his car was towed to the police station because of dried blood on the passenger side; Detective Howard escorted Brown through an entrance to the police station that is located apart from the entrance for the general public; Brown was placed in an isolated interrogation room upon his arrival; and Brown was arrested at the conclusion of the interrogation.
The Majority reaches this conclusion by placing great weight on those facts, many of which do not strongly favor Miranda custody, while de-emphasizing or omitting other facts that, taken together with the facts the Majority highlights, should lead to a conclusion that Brown was not in Miranda custody. Those facts include that Detective Howard told Brown that he was going to the police station to give a statement as a “victim”; Brown was not handcuffed; Detective Howard repeatedly assured Brown that he was not under *221 arrest; Brown slept during the ride and appeared to be in only “a little bit of pain”; Detective Howard told Brown, in response to Brown’s expressed concern about getting himself home, that proper arrangements would be made; Brown was not restrained at any time before or during the interrogation; he remained alone in the interview room for only fifteen minutes before the interrogation began; the sole interrogator, Detective Flynn, was dressed in plain clothes and was not armed; and Brown gave the statements at issue during the first six minutes of the interrogation. I am of the opinion that the Supreme Court’s Miranda jurisprudence, to which this Court is bound, compels a different conclusion than that which the Majority reaches today. Adherence to the custody analysis as developed by the Supreme Court in the cases following Miranda leads me to conclude that Brown was not in Miranda custody at the time he made the statements that are at issue in this appeal.
I
“The Miranda decision is grounded in that portion of the Fifth Amendment to the Constitution that provides: ‘No person ... shall be compelled in any criminal case to be a witness against himself.’”[1] Lee v. State, 418 Md. 136, 149, 12 A.3d 1238 (2011). The Miranda Court, “intent on 'giv[ing] concrete constitutional guidelines for law enforcement agencies and courts to follow,’ ” implemented “certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.” Florida v. Powell, 559 U.S. 50, 59, 130 S.Ct. 1195, 175 L.Ed.2d 1009 (2010) (alteration in original) (citations omitted); see also Lee, 418 Md. at 149, 12 A.3d 1238 (“One of the Court’s stated aims in establishing the Miranda rule [was] to ‘assure that the individual’s right to choose between silence and speech remains *222 unfettered throughout the interrogation process.’ ”) (citation omitted).
“The prophylactic measures developed in Miranda took the form of the now-familiar warnings that law enforcement personnel must deliver to a suspect before undertaking any custodial interrogation.” State v. Luckett, 413 Md. 360, 377, 993 A.2d 25 (2010). Among the warnings are that a person subject to a custodial interrogation must be advised of his right to remain silent, that his statements may be used against him, and that he has a right to counsel. Id. at 377-78, 993 A.2d 25, 33 (citing Miranda, 384 U.S. at 479, 86 S.Ct. 1602). Important for present purposes is the requirement that those warnings be given when a defendant is subject to a “custodial interrogation.”
The Miranda Court held that the now-well-known warnings are to precede “custodial interrogation,” by which the Court meant, “questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Miranda, 384 U.S. at 444, 86 S.Ct. 1602. The Miranda Court did not define what, in this context, “custody” means. The Supreme Court, however, has done so since then. “As used in our Miranda case law, ‘custody’ is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.” Howes v. Fields, 565 U.S. 499, 508-09, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012).
Determining custody is a multi-step process. As the Majority recognizes, “the initial step is to ascertain whether, in light of ‘the objective circumstances of the interrogation,’ a ‘reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.’ ” Id. at 509, 132 S.Ct. at 1185 (citations omitted). Yet, that determination is not the end of the analysis. “Not all restraints on freedom of movement amount to custody for purposes of Miranda.... ‘Our cases make clear ... that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody.’ ” Id. (quoting Maryland v. Shatzer, 559 *223 U.S. 98, 112, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010)); accord Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). “[T]he ultimate inquiry is simply whether there [was] a ‘formal arrest or restraint on freedom of movement’ of the degree associated with a formal arrest.” California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam)).
Miranda custody, moreover, is measured in light of “all of the circumstances surrounding the interrogation,” Fields, 565 U.S. at 509, 132 S.Ct. 1181 (citation omitted), and “must be determined based on how a reasonable person in the suspect’s situation would perceive his circumstances,” Yarborough v. Alvarado, 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). This test does not take into account how much the police know about the person being interrogated; those circumstances are irrelevant to the Miranda custody inquiry. See Beheler, 463 U.S. at 1125, 103 S.Ct. 3517. Likewise irrelevant are the subjective beliefs of either the officer(s) conducting the interrogation or the person being interrogated. Stansbury v. California, 511 U.S. 318, 324-25, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam).

II

Brown was not in Miranda custody at the time he made the statements that are at issue in this appeal.
The Majority places much stock in the court’s use of the word “acquiesced” rather than “consented” in describing Brown’s response at the hospital to Detective Howard’s request that he “consent to coming back” to the police station to give a statement. The Majority concludes that, “in the light most favorable to Brown, his acquiescence, under the totality of the circumstances, necessarily indicates a lack of voluntariness, or at the very least, an atmosphere of compelling pressure.” Maj. Op. at 212, 156 A.3d at 848. As support for this conclusion, the Majority points out that Detective Howard *224 arrived at the hospital in the early morning hours, was visibly armed, and told Brown that he had been directed to “obtain” Brown for questioning. Id. The Majority also emphasizes that Brown was dressed in disposable hospital scrubs and suffering from multiple gunshot wounds, and was without his vehicle. Id. at 213-14, 156 A.3d at 849.
I would not attach the same significance that the Majority does to the suppression court’s use of the word “acquiesced” in describing Brown’s response to Detective Howard’s request that he “consent to coming back” to the police station. Even viewed in the light most favorable to Brown, it is too much an inferential stretch to conclude, from the suppression court’s use of the word, that the court must have found as a fact that Brown went against his will with Detective Howard to the police station. Neither do other facts to which the Majority points—the detective’s use of the word “obtain” and Brown’s inability to access his vehicle—dictate a different conclusion. We consider those facts, as we must, in conjunction with the facts that Detective Howard told Brown that he was going to the police station to give a statement as a “victim”; Brown was not handcuffed; Detective Howard repeatedly assured Brown that he was not under arrest; Brown slept during the ride and appeared to be in only “a little bit of pain”;[2] and, in response to his expressed concern about getting himself home, the detective told Brown that proper arrangements would be made. Further, I am of the opinion that Brown’s attire, consisting of disposable shirt-and-pants hospital scrubs and boots, does not rise to the level of the “state of undress” discussed in Bond v. State, upon which the Majority relies. Maj. Op. at 213, 156 A.3d at 848; see Bond v. State, 142 Md.App. 219, 234, 788 A.2d 705 (2002) (concluding that the defendant was in Miranda custody in part because he was “questioned late at night, in bed, undressed, by three officers blocking the bedroom door”).
The Majority properly recognizes that police questioning at a station house does not automatically render an individual in *225 Miranda custody. Maj. Op. at 215, 156 A.3d at 849; see Mathiason, 429 U.S. at 495, 97 S.Ct. 711. The Majority states, however, that Brown’s being transported directly from the hospital to the police station constitutes a “drastic change in circumstances” signifying the “inherently coercive pressures” Miranda was designed to protect against. Maj. Op. at 216, 156 A.3d at 855 (citing Fields, 565 U.S. at 509, 132 S.Ct. 1181). Although being transported from a hospital to the police station is indeed more of a “sharp” change of circumstances than in Fields, 565 U.S. at 511, 132 S.Ct. 1181, where the defendant was questioned while already serving a prison term, I would not place as much weight on this fact as does the Majority. Indeed, Brown’s being transported directly from the hospital to the police station must be considered in combination with the surrounding circumstances. See Thomas v. State, 429 Md. 246, 260, 55 A.3d 680 (2012) (“A court ... does not parse out individual aspects so that each circumstance is treated as its own totality in the application of the law.”). Brown was told that Detective Flynn wanted to get “his story for his side of the events being he was a victim of that shooting” and was assured that proper arrangements would be made for his transportation home. This interaction was entirely consistent with the police officers’ treatment of Brown as a shooting victim from the moment Trooper Fellon met him at the apartment complex up to and inclusive of the first six minutes of the interrogation, which is the portion of the interrogation that concerns us. A reasonable person, under the same circumstances, would not feel effectively under arrest and unable to terminate the encounter.
Moreover, even if Brown felt he was not free to decline the detective’s request, that fact alone, or in combination with other facts, viewed in the light most favorable to Brown, does not demonstrate that he was subject to the “ ‘restraint on freedom of movement’ of the degree associated with a formal arrest” that is the hallmark of Miranda custody. Beheler, 463 U.S. at 1125, 103 S.Ct. 3517 (quoting Mathiason, 429 U.S. at 495, 97 S.Ct. 711); accord Berkemer v. McCarty, 468 U.S. 420, 440-42, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (not every *226 restraint on movement or nonconsensual encounter with the police constitutes Miranda custody).
My assessment does not change with the addition of the remaining facts leading up to and including what occurred during the first six minutes of the interrogation. I consider that Brown entered the police station through an entrance not used by the general public; he and Detective Howard were met by Detective Flynn and a second officer; the interview room was located in an area of the police station inaccessible to the public; and the interview room was windowless and the door to it closed. I also take into account that Brown was not restrained at any time before or during the interrogation; he remained alone in the interview room for only fifteen minutes before the interrogation began; the sole interrogator, Detective Flynn, was dressed in plain clothes and was not armed; and Brown gave the statements at issue during the first six minutes of the interrogation. Viewed in their totality, these facts would not lead a reasonable person in Brown’s position to consider himself effectively under arrest.
The Majority cites Buck v. State, 181 Md.App. 585, 626, 956 A.2d 884 (2008), for the proposition that, “when a suspect has been told by the police, clearly and unequivocally, that he is not under arrest and can leave at any time, but the contemporaneous conduct of the police has the effect of nullifying that advice, the advice ‘will not carry the day.’” Maj. Op. at 218, 156 A.3d at 851. According to the Majority, the “contemporaneous conduct of the police had the effect of nullifying the notion that Brown was considered as only a victim.” Id. at 219, 156 A.3d at 852. In Buck, an officer stated, in Buck’s presence, “I think we got him.” 181 Md.App. at 597, 956 A.2d 884. The next day, officers took Buck in a police cruiser to the police station, where the interrogation lasted about five hours. Id. at 598-99, 956 A.2d 884. Despite being told that he was not under arrest and was free to leave, “Buck was asked accusatory questions, was told his house was being searched for evidence in the ... murder,” and he gave a DNA sample. Id. at 626, 956 A.2d 884. The Court of Special Appeals in Buck concluded that the officers’ conduct had the effect of “nullifying” the *227 officers’ statements that Buck was not under arrest and was free to leave largely because the officers communicated to Buck that he was a suspect in the investigation. See id. at 622, 626, 956 A.2d 884.
Unlike in Buck, the record in the case before us gives no indication that the officers ever communicated to Brown that he was a suspect. Brown acknowledges that the suppression court made no explicit finding on this score, The most the suppression court made of the evidence was that, at the time Detective Howard met Brown at the hospital, he was “at the very least a person of interest in the homicide” and “early in the investigation,” Brown’s vehicle was referred to as the “suspect” vehicle. For purposes of the custody analysis, however, when or how the police came to refer to the “suspect” vehicle is of no consequence given there is no indication that the reference was conveyed to Brown. Added to those facts are the facts that Detective Howard asked Brown to accompany him to the police station to make a statement “as a victim,” repeatedly told Brown that he was not under arrest, and assured Brown that “proper arrangements” would be made for his travel home. The questions Detective Flynn posed to Brown during the first six minutes of the interrogation were not accusatory in content. Moreover, the suppression court, which had the benefit of an audio and video recording of the interrogation, did not find that Detective . Flynn used an accusatory tone in questioning Brown or employed any other intimidating tactics during those six minutes.
The Majority suggests that the interrogation here was even more custodial than in Buck because, unlike Buck, Brown was not informed at the outset of the interrogation or at any time thereafter that he was free to leave or free to terminate the interrogation. Maj. Op. at 218-19, 156 A.3d at 851-52. Tellingly, the Majority does not follow that assertion with a citation to authority suggesting that the absence of such information indicates Miranda custody, and we know of none. See Thomas, 429 Md. at 272, 55 A.3d 680 (concluding that, “although the police never uttered the talismanic words ‘you are free to go,’ ” Thomas was not in custody for Miranda purposes and the circuit court judge erred in granting the motion to suppress); *228 cf. Ohio v. Robinette, 519 U.S. 33, 35, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (holding, in the Fourth Amendment context, that a defendant need not be informed that he is “free to go” for his consent to search to be considered voluntary).
In the end, the facts should not compel the conclusion that Brown was in Miranda custody during the first six minutes of the interrogation. Beheler, supra, 463 U.S. at 1121, 103 S.Ct. 3517, is materially the same as this case and informs my conclusion. As here, the question before the Supreme Court was whether Beheler was in Miranda custody when he gave a statement in response to police questioning. Id. Like Brown, Beheler was interrogated at the police station soon after the crime occurred. Id. at 1124, 103 S.Ct. 3517. Like Brown, Beheler was told he was not under arrest and “agreed” (in the words of the Supreme Court) to accompany the police to the stationhouse. Id. at 1122, 103 S.Ct. 3517. Beheler had been drinking earlier that day, and was emotionally distraught at the time of the interrogation. Id. at 1124-25, 103 S.Ct. 3517. Brown, though evidently not “distraught,” complained to Detective Howard of being in “a little bit of pain from the gunshot wounds, but other than that he seemed fine.” See United States v. Infante, 701 F.3d 386, 397-98 (1st Cir. 2012) (concluding that Infante was not in custody when he was interrogated in the hospital following medical treatment and noting that, “[d]espite having received pain medication, Infante was coherent and responsive, showing no sign of mental impairment”), cert. denied, — U.S. -, 133 S.Ct. 2841, 186 L.Ed.2d 896 (2013). Beheler had been drinking; Brown, who Detective Flynn said smelled of alcohol, might have imbibed earlier that night, but according to the detective did not appear to be intoxicated. The Beheler Court concluded that, taken together, the facts of that case did not amount to Miranda custody. 463 U.S. at 1125, 103 S.Ct. 3517. See also Spencer v. United States, 132 A.3d 1163, 1168-69 (D.C. 2016) (holding that a defendant questioned at a police station was not in custody for Miranda purposes where the defendant was taken to the police station in the back of a police car, was never left alone but was “never handcuffed or restrained in *229 any way,” was frisked by the police officer, and was told that he was not under arrest).
In sum, the circumstances, taken together, lead me to conclude that Brown was not in Miranda custody at the time he made the statements that are at issue in this appeal. I would therefore affirm the judgment of the Court of Special Appeals, which came to the same conclusion.
Judge McDonald has authorized me to state that he joins this dissent.

. This provision of the Fifth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

. Because Brown did not testify at the suppression hearing, we have only the detective’s assessment of Brown’s level of pain.