2023 IL App (1st) 191079

FIRST DISTRICT
SECOND DIVISION
June 13, 2023

No. 1-19-1079

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 04242 |
| | ) | |
| DANIAL LEANOS, | ) | Honorable |
| | ) | Geary W. Kull, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Danial Leanos, was 18 years old when he confessed to shooting and killing

Henry Martinez, a member of a rival gang. Defendant's youthful age figures prominently in both

of his appellate issues. First, he argues that his *Miranda* waiver was rendered invalid by various

interrogation tactics that were duplicitous in their own right, and all the more so in light of his

youth and immaturity. Second, he argues that the trial court short-circuited counsel's attempt to

raise a youth-based, as-applied sentencing challenge under the proportionate penalties clause of

the Illinois Constitution, based on an erroneous belief that such challenges are not available to a

defendant who has passed his 18th birthday.

¶ 2     We find that defendant's *Miranda* waiver was valid, and that counsel never actually tried

to raise an as-applied challenge under the state constitution. (But defendant remains free to raise

such a challenge in a postconviction petition.) We thus affirm his conviction and sentence.

¶ 3     That said, we do find some of the detectives' interrogation tactics troubling and worthy of

sustained scrutiny, especially since they raise issues of first impression for the Illinois reviewing

courts. First among them was a pair of assurances to defendant that "What you tell us is stayin' in here," and "What you say here, stays here with us right now."

¶ 4    However these assurances were intended, they could have been reasonably understood as promises of confidentiality—blanket assurances that defendant's statements would be held in confidence by the police and not used against him in a criminal proceeding. Promises of confidentiality squarely contradict the *Miranda* warnings.

¶ 5    Suppression is not warranted here, however, because—and only because—we are convinced that, when all was said and done, these assurances were far attenuated from defendant's confession and not remotely responsible for it.

¶ 6                                    BACKGROUND

¶ 7    Henry Martinez, a member of the Two-Six gang, was shot and killed on the night of February 1, 2012. Martinez was in the living room of his second-floor Cicero apartment when a gunshot was fired from outside, came in through his window, and struck him in the back. Based on their initial investigation, the police quickly suspected that the shooting was carried out by a member of a rival gang, namely, the Maniac Latin Disciples (MLDs).

¶ 8    The Cicero Police Department began targeting MLDs in the area. One can only imagine that defendant, whose bike was found abandoned at the murder scene, was first, or close to it, on their list. And as it happened, a tactical officer arrested him about two hours after the shooting and some three blocks away. Officially, his offense was underage drinking. Defendant, we are told, was seen with a beer on the sidewalk.

¶ 9    Around 1:30 in the morning, Detectives Leuzzi and Struska, who were investigating the murder, learned that defendant was in custody. Leuzzi knew defendant, and his mother and brother, from various prior interactions. Leuzzi would later insist, at the suppression hearing, that

defendant entered the picture solely as a prospective witness and not as suspect. Be that as it may, with defendant under arrest for drinking a beer, the detectives could now confront him about the murder in the context of a custodial (indeed, station house) interrogation. But for now, it was late, and defendant may have been drunk, so best to let him sleep it off in the lockup. The interrogation could wait until the following afternoon.

¶ 10    We will return to the details of the interrogation later, as they become relevant to our analysis. For now, a brief overview will provide context for defendant's claims. Leuzzi and Struska first spoke to defendant around 1 p.m. on the day after the murder, about 12 hours after he was arrested. Early on, the detectives read defendant his rights, and he initialed next to each warning on a preprinted form to indicate that he understood them. They did not explicitly ask whether he wanted a lawyer or wished to speak to the police at that time.

¶ 11    The detectives, remaining circumspect for the time being, told defendant that "something happened" the night before and they were "just trying to figure it out." They discussed the reason for defendant's arrest—as the story goes, an officer saw him with a beer in his hand on the street. Defendant denied that he had been drinking the night before. But he did confirm that he was an MLD from Martinez's neighborhood.

¶ 12    This first round of interrogation was brief, lasting about 15 minutes. All told, there would be four successive rounds, separated by short breaks. About 3½ hours after the start of the interrogation, defendant confessed that he shot Martinez. (There were some more rounds after that, but they are not relevant for our purposes here.)

¶ 13    During the second and third rounds of interrogation, defendant told a series of different stories, each of which the detectives quickly debunked. At first, he said he was with his mother and sister at the pertinent times. But the detectives had already spoken to his family, and even

they had contradicted his claims. Defendant then said he was with a female acquaintance named Nellie and thus continued to maintain that he had no knowledge of the murder. But his timeline did not match the statements of various other witnesses who put him at the scene.

¶ 14 It was shortly after defendant claimed he was with Nellie, during the second round of interrogation, that the detectives made the alleged promises of confidentiality. As they said to him, "What you tell us is stayin' in here," and "What you say here, stays here with us right now." They also said, a number of times, that they thought defendant was lying to protect another member of his gang.

¶ 15 By the third round of interrogation, the detectives were forcefully insisting that defendant was present for, and had knowledge of, the murder—though they still believed, or at least they continued to tell defendant, that they did not think he was the shooter. Defendant switched gears and said he was down the street on the next block when Martinez was shot. And he named one Derrick Jones as the shooter. The detectives impressed on defendant that this was his last chance to tell the truth before the case was presented to the state's attorney and defendant got "locked into" his statements. Defendant stuck to this story and continued to point the finger at Jones.

¶ 16 During the next break in the interrogation, the detectives ascertained that Jones was in custody, in Cook County Jail, when Martinez was shot. During the fourth (and for our purposes final) round of interrogation, the detectives squarely confronted defendant with their suspicion that *he* was the shooter. And that is when he finally admitted that he was.

¶ 17 During the custodial interview, defendant was shown a photo of a chrome bicycle that the police found in a nearby gangway during the initial sweep of the scene. He identified the bike as his and said that he left it in the street after the shooting. He also accompanied the detectives on a videotaped walk-though of the scene. He showed them where he was standing when he fired the

shot that hit Martinez (and a few others that hit the side of the building). Four spent casings had been recovered from that area during the initial sweep. And he showed the detectives where he tossed the gun in the gangway. The gun was never recovered.

¶ 18    Defendant moved to suppress his confession on both *Miranda* and voluntariness grounds. The motion was denied after a hearing, at which Leuzzi was the sole witness, and the confession was admitted at defendant's bench trial as the State's key piece of evidence. In fact, it was nearly the whole of the State's case, which consisted of the confession and one piece of forensic evidence: gunshot residue on the jacket and flannel that defendant was wearing when he was taken into custody on the night of the shooting.

¶ 19    Defendant took the stand and recanted his confession. He testified, in sum, that he spent the night drinking and smoking pot with various people. Eventually, he made his way to Arturo's house, a friend and fellow MLD who lived down the block from Martinez. He was hoping to catch a ride home from Arturo, since he was in no shape to ride his bike. While defendant was in Arturo's gangway, he heard some other MLDs arguing with some Two-Six gang members.

¶ 20    Defendant crossed the street and encountered "Porky" and Rolando (also referred to as Ronaldo at various points in the record) arguing with two people inside a building. Defendant shook hands with them. As he stood there, about an arm's length away, Rolando started shooting. Defendant ran to his grandmother's house. Nobody answered the door, so he hid in the gangway where he was later arrested. He denied that the bike found near the scene was his.

¶ 21    Defendant testified that he falsely confessed to shooting Martinez because he was afraid of gang retaliation if he pointed the finger at anyone else: "snitches get stiches," as he repeatedly said. So he took the fall for Martinez's murder to avoid being killed himself. On top of that, he was "tired" and "hungover" from drinking and smoking the night before. And he felt "harassed"

by the detectives' persistent questioning, as they debunked each of various false accounts of events that he offered.

¶ 22    The trial court evidently did not believe defendant's recantation and testimony, finding him guilty of Martinez's murder. The court imposed the minimum sentence of 45 years: 20 years for first degree murder, plus 25 years for the mandatory firearm enhancement. He now appeals.

¶ 23                                    ANALYSIS

¶ 24                                        I

¶ 25    Defendant argues that various deceptive interrogation tactics undermined the efficacy of his *Miranda* warnings and thus rendered his waiver invalid. These tactics, he adds, must all be understood against the backdrop of his youth and immaturity—at the age of 18, he was just barely an adult in the eyes of the law. The tactics at issue overlap in various ways, but we find they can be grouped into four main categories of alleged *Miranda* error. We will take each in turn. But first, a few preliminary words about the appropriate standard of review.

¶ 26                                        A

¶ 27    To be valid, a *Miranda* waiver must be *voluntary*, "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and *knowing and intelligent*, meaning that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *People v. Braggs*, 209 Ill. 2d 492, 514-15 (2003).

¶ 28    In determining whether a *Miranda* waiver was both voluntary and knowing, or in a word, valid, we consider the " 'totality of the circumstances surrounding the interrogation.' " *Burbine*, 475 U.S. at 421. This includes the suspect's age, background, and intelligence, as well as the conduct and statements of the interrogating officers. *Braggs*, 209 Ill. 2d at 515; *People v. Brown*,

2012 IL App (1st) 091940, ¶ 25. It is the State's burden to prove a valid waiver by a preponderance of the evidence. *Braggs*, 209 Ill. 2d at 505.

¶ 29    Suppression motions generally present "mixed questions of law and fact," to which we apply the bifurcated standard of review established in *Ornelas v. United States*, 517 U.S. 690 (1996), and first adopted by our supreme court in *In re G.O.*, 191 Ill. 2d 37 (2000).

¶ 30    We review the trial court's findings of "historical fact" under the deferential manifest-weight standard. *Ornelas*, 517 U.S. at 696, 699; *G.O.*, 191 Ill. 2d at 49-50. The "basic, primary, or historical facts" are simply a "recital of external events," through which "the scene is set and the players' lines and actions are reconstructed," so that the governing legal standards can be applied. (Internal quotation marks omitted.) *Thompson v. Keohane*, 516 U.S. 99, 109-12 (1995). In short: the who, what, when, where, why, and how. Our review is deferential because the trial court, having conducted the suppression hearing, is in the best position to assess the credibility of the various "narrators," the fact witnesses, from whom this account of "what happened" is culled. (Internal quotation marks omitted.) *Id.* Though here, we would note, the historical facts are in plain view on the video.

¶ 31    But we review *de novo* the trial court's determination regarding the ultimate ground for suppression raised in the motion. *G.O.*, 191 Ill. 2d at 49-50. Here, defendant seeks to suppress his confession on the ground that his *Miranda* waiver was invalid. Thus, we review *de novo* the trial court's determination on this ultimate issue. *Braggs*, 209 Ill. 2d at 505 (knowing waiver determination reviewed *de novo*); see also *G.O.*, 191 Ill. 2d at 49 (voluntariness of confession reviewed *de novo*); *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001) (fourth amendment rulings reviewed *de novo*).

¶ 32    *De novo* review is the mechanism that allows reviewing courts "to maintain control of,

and to clarify, the legal principles" at issue, to establish a unified body of precedent, and thus to "provid[e] law enforcement officers with a defined set of rules," in advance, for conducting searches, seizures, and interrogations. (Internal quotation marks omitted.) *Ornelas*, 517 U.S. at 697-98; *G.O.*, 191 Ill. 2d at 47-49.

¶ 33 The need for independent appellate review of the validity of *Miranda* waivers is evident, even though, as the State says, the issue is in *some* sense a "question of fact," though certainly not one of *historical* fact. But see *Brown*, 2012 IL App (1st) 091940, ¶ 26 (deferential review of knowing-waiver finding). The voluntariness of a confession is, in an analogous sense, also a question of fact, but *de novo* review is still appropriate and even necessary. Why? Because voluntariness, in general, depends on two things: whether the particular suspect's will was in fact overborne, and whether, as a legal matter, the interrogation methods were "compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means." *Miller v. Fenton*, 474 U.S. 104, 116 (1985); see *G.O.*, 191 Ill. 2d at 48.

¶ 34 Similarly, the validity of a *Miranda* waiver depends, in part, on whether the interrogators employed "procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444; see *Florida v. Powell*, 559 U.S. 50, 54-55 (2010) (reviewing, as a matter of law, whether *Miranda* guarantees were " 'vitiate[d]' " by deviation from standard warnings). A valid waiver (like a voluntary confession) thus depends, among other things, on the absence of "police overreaching" during the interrogation. *Colorado v. Connelly*, 479 U.S. 157, 170 (1986).

¶ 35 If the reviewing courts are to ensure that *Miranda*'s guarantees are given full effect, they must be free to articulate standards for police conduct throughout the course of a custodial interrogation and determine for themselves whether those standards were upheld—or whether,

for example, the police engaged in tactics that undermined *Miranda*'s intended protections. This case clearly illustrates the need for such standards and thus for independent appellate review.

¶ 36                                                        B

¶ 37     We begin with defendant's most troubling allegation. The detectives promised defendant, in Leuzzi's words (captured on video), "What you tell us is stayin' in here," and "What you say here, stays here with us right now." This point of error raises a question of first impression for the Illinois reviewing courts: under what circumstances, if any, does a promise of confidentiality render a *Miranda* waiver invalid?

¶ 38     A "blanket promise of confidentiality," as we will use the term, is an assurance that a suspect's statements during a custodial interrogation will be held in confidence by the police for all purposes—most notably that the suspect's statement will *not* be used against him in a criminal proceeding.

¶ 39     Blanket promises of confidentiality, in this full-blooded sense, must be distinguished from a superficially similar, but fundamentally different, kind of promise: a *limited* promise that the police will not disclose the suspect's statements or identity to particular people outside of the criminal process. A suspect may, for example, fear retaliation from his fellow gang members for snitching, and the police may promise to keep the source of the suspect's information anonymous. Or a suspect may fear that an employer or spouse might get wind of certain information, and the police accordingly assure the suspect that they will not publicly share certain information. In breaking a *limited* promise not to disclose a suspect's statement or identity to his gang or family, the police do not effectively "compel[ ]" him, by means of deception, "to be a witness against himself" in a criminal proceeding. See U.S. Const., amend. V.

¶ 40 But that is exactly what happens when a *blanket* promise of confidentiality induces a statement from a suspect that is later used against him at his criminal trial. This tactic allows the police to turn the unwitting suspect into a witness against himself by undermining the procedural safeguards or prophylactic measures that *Miranda* put in place to protect the suspect's fifth amendment right against self-incrimination. See *Miranda*, 384 U.S. at 439; *Dickerson v. United States*, 530 U.S. 428, 450-51 (2000) (Scalia, J., dissenting, joined by Thomas, J.).

¶ 41 To put a finer point on it, a blanket promise of confidentiality blatantly contradicts the second of the four warnings: "the explanation that anything said can and will be used against the individual in court." *Miranda*, 384 U.S. at 469; see also *id.* at 444 ("Prior to any questioning, the person must be warned that he has a right to remain silent [and] that any statement he does make may be used as evidence against him ***."). This "critical advice" informs the suspect of the consequence of his choice to make a statement to the police; it is thus essential for a knowing waiver of his rights. *Colorado v. Spring*, 479 U.S. 564, 574 (1987); *Miranda*, 384 U.S. at 469. A blanket promise of confidentiality falsely assures the suspect that he can safely ignore this particular warning.

¶ 42 We are far from the first court to note that a blanket promise of confidentiality "directly contradicts," "undercut[s]" (*State v. O.D.A.-C.*, 273 A.3d 413, 422 (N.J. 2022)), "nullif[ies]" (*State v. Clark*, 799 S.E.2d 192, 195-96 (Ga. 2017); *State v. Stanga*, 2000 SD 129, ¶ 19, 617 N.W.2d 486), "countermand[s]" (*Leger v. Commonwealth*, 400 S.W.3d 745, 751 (Ky. 2013)), "subvert[s]" (*State v. Alexander*, 2018-1772 (La. 12/03/18); 257 So. 3d 672 (*per curiam*)), or "vitiates" (*Lee v. State*, 12 A.3d 1238, 1247-48 (Md. 2011)), this *Miranda* warning.

¶ 43 Promises of confidentiality have been repeatedly condemned for this reason. "Courts have long recognized that '[a] police officer cannot directly contradict, out of one side of his

mouth, the *Miranda* warnings just given out of the other.' " *O.D.A.-C.*, 273 A.3d at 420-21. Thus, as relevant here, "[a]n officer cannot read the defendant his *Miranda* warnings and then turn around and tell him that despite those warnings, what the defendant tells the officer will be confidential and still use the resultant confession against the defendant." *Hopkins v. Cockrell*, 325 F.3d 579, 585 (5th Cir. 2003). The *Miranda* "warnings would be senseless if interrogating officers can deceive suspects into believing their admissions will not go beyond the interrogation room." *Stanga*, 2000 SD 129, ¶ 19, 617 N.W.2d 486.

¶ 44     Thus, notwithstanding all the trickery and deceit that interrogators may, in general, legally and constitutionally employ, the *Miranda* rule imposes an "absolute prohibition upon any trickery which misleads the suspect as to the existence or dimensions of" the prophylactic rights enshrined in the *Miranda* warnings. 2 Wayne R. LaFave *et al.*, Criminal Procedure §§ 6.2(c), 6.9(c) (4th ed. 2022 Update).

¶ 45     Because a false promise of confidentiality surely ranks among the "kinds of trickery" that the *Miranda* rule was "designed to guard against" (*Berkemer v. McCarty*, 468 U.S. 420, 438 n.27 (1984)), courts have held that a promise of this kind "vitiates" a suspect's *Miranda* waiver "by rendering it unknowing, involuntary, or both." *Lee*, 12 A.3d at 1248. We think the best answer is "both." The *Miranda* decision itself bears out this view.

¶ 46     As for a *knowing* waiver: a promise of confidentiality, as noted above, contradicts the "explanation that anything said can and will be used against the individual in court." *Miranda*, 384 U.S. at 469. And "[i]t is only through an awareness of these consequences that there can be any assurance of *real understanding and intelligent exercise* of the privilege." (Emphasis added.) *Id.* In other words, a promise of confidentiality contradicts the specific warning that *Miranda* singled out as the key prerequisite for a knowing waiver; in so doing, it thus "cast[s] doubt on

whether a defendant fully understood and knowingly waived his rights." *O.D.A.-C.*, 273 A.3d at 422. Indeed, when a suspect is duped into making a statement by a promise of confidentiality, it is clear that he does *not* understand the consequences of waiving his rights. That suspect's waiver is not made knowingly.

¶ 47    As for a *voluntary* waiver: *Miranda* was quite clear that "any evidence that the accused was threatened, *tricked*, or cajoled into a waiver will, of course, show that the defendant did not *voluntarily* waive his privilege." (Emphases added.) *Miranda*, 384 U.S. at 476. A false promise of confidentiality is nothing if not a means of tricking a suspect into waiving his privilege and making a statement to the police. When a suspect is duped into making a statement by a promise of confidentiality, that suspect's waiver is not made voluntarily, either.

¶ 48    In a promise of confidentiality, misinformation about the consequences of a waiver is precisely the "fraud" that tricks the suspect into waiving his rights. See *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990). The knowing and voluntary requirements, though generally distinct, overlap in this instance. If a promise of confidentiality induces a suspect to talk when he otherwise would have remained silent, it undermines *both* requirements for a valid waiver.

¶ 49                                                C

¶ 50    It is true that the promises of confidentiality here were made mid-interrogation—after defendant was read his rights and signed a so-called *Miranda* waiver form. But a waiver that is initially valid can be vitiated by police conduct later in the interrogation. A waiver of the right to remain silent is not a signature on a preprinted form; it is a decision to speak to the police. It is not a static moment in time; that decision is a *continuing* one, because the suspect retains the right to revoke it (or condition it on the presence of counsel) at any time. *Berghuis v. Thompkins*, 560 U.S. 370, 387-88 (2010); *Miranda*, 384 U.S. at 473-74.

¶ 51    Thus, a waiver remains valid only if "the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." *Miranda*, 384 U.S. at 469. Mid-interrogation tactics that render the decision to speak or keep speaking "unknowing, involuntary, or both" vitiate the suspect's waiver, at least from that point forward—even though he received proper warnings and initially agreed to talk. *Lee*, 12 A.3d at 1248. A promise of confidentiality is one such tactic: proper warnings may have resulted in a knowing waiver thus far, but the later promise of confidentiality may then cast serious doubt on whether the suspect "*at all times \*\*\** was aware of the State's intention to use his statements to secure a conviction." (Emphasis added.) *Burbine*, 475 U.S. at 422.

¶ 52                                                        D

¶ 53    So far we have established that post-waiver, mid-interrogation, blanket promises of confidentiality are entirely inconsistent with *Miranda*. The question we must now answer is how to apply those principles to a particular case.

¶ 54    On the one hand, we could adopt a *per se* rule that any post-waiver promise of confidentiality will necessarily and automatically be deemed a vitiation of the *Miranda* waiver, thus requiring suppression of any subsequent incriminating statement made by the suspect. On the other hand, we could adopt a more nuanced, case-by-case determination of whether the blanket promise of confidentiality, *in fact*, induced the suspect to make the incriminating statement, taking into account the totality of the circumstances.

¶ 55    The majority rule, adopted in nearly every case we have cited, is the latter. That is, suppression is warranted only when, in fact, a false, blanket promise of confidentiality induced the suspect's incriminating statement. See, *e.g.*, *O.D.A.-C.*, 273 A.3d at 422; *Leger*, 400 S.W.3d at 751; *Clark*, 799 S.E.2d at 196; *Commonwealth v. Santana*, 82 N.E.3d 986, 994 (Mass. 2017).

We adhere to that rule today as the rule most consistent with *Miranda*'s rule of suppression. *Miranda*, 384 U.S. at 476; *Harris v. New York*, 401 U.S. 222, 226 (1971).

¶ 56    Every case will be different, but it is not hard to imagine any number of facts and factors that could differentiate one scenario from the other. The suspect might, through words or actions, make it clear that he discredits the officer's promise of confidentiality. The officer might immediately correct the misstatement and reiterate that a suspect's incriminating statement would *not* be kept confidential. See, *e.g.*, *Santana*, 82 N.E.3d at 994-95.

¶ 57    A single confidentiality promise made early on in an interrogation that continues over multiple rounds and multiple hours, at the end of which the suspect confesses, could well be viewed differently than an incriminating statement made in direct and immediate response to a promise of confidentiality. Compare *Lee*, 12 A.3d at 1243 (defendant confessed "[n]ot long after" confidentiality promise), with *Carswell v. State*, 491 S.E.2d 343, 346 (Ga. 1997) (confession was "quite remote from, and not prompted by, the investigator's claim that they were speaking off the record"). Likewise, a single, isolated misstatement far removed from a confession might look different than repeated promises of confidentiality throughout the interrogation. See *O.D.A.-C.*, 273 A.3d at 422 (court would not "isolate and minimize the string of misrepresentations" of confidentiality, as "[c]umulatively, the number and significance of the detective's misleading statements undermined the *Miranda* warnings.").

¶ 58    It would be unrealistic to believe that each of these scenarios, and countless others with their countless derivations, should be painted with the same brush. A *per se* rule that a promise of confidentiality will automatically result in suppression—a "gotcha" rule—would treat those scenarios as equivalent. A *per se* rule is not warranted.

¶ 59    Whether a blanket promise of confidentiality vitiates an otherwise valid *Miranda* waiver

- 14 -

should depend on whether the false promise gets any traction with the suspect, or whether the suspect is able to see through it. If the record shows that the suspect continued to grasp the consequences of making a statement, despite the deceptive promise, his waiver will remain valid, and there will be no basis for suppressing any statement he goes on to make.

¶ 60    We should not be misunderstood. A blanket promise of confidentiality contradicts the *Miranda* warnings. A police officer should never make such a promise—never. See *Leger*, 400 S.W.3d at 750 ("Artful deception is an invaluable and legitimate tool in the police officer's bag of clever investigative devices, but deception about the rights protected by *Miranda* and the legal effects of giving up those rights is not one of those tools."). If an officer does imply that a suspect's statements will remain confidential in the prohibited sense, the officer should promptly correct the misstatement by telling the suspect that any incriminating statements he makes can and will be used against him—ideally, by re-administering a fresh round of *Miranda* warnings. If these remedial steps are taken, the misstatement likely will not result in the suppression of an otherwise legally obtained statement. See, *e.g.*, *State v. Dodge*, 2011 ME 47, ¶ 18, 17 A.3d 128.

¶ 61    And we reiterate that it will be the State's burden to show that the *Miranda* waiver remained effective, notwithstanding the false promise of confidentiality.

¶ 62    Our holding is based on the *Miranda* rule. We do not reach the question whether a promise of confidentiality renders a confession involuntary under general due-process standards, unrelated to *Miranda* violations, as that issue has not been raised on appeal. Suffice it to say for now: a blanket promise of confidentiality runs a real risk of suppression.

¶ 63                                              E

¶ 64    That brings us to the circumstances of defendant's interrogation. Our first question is whether any promises of confidentiality were made. A few minutes into the second round of

interrogation, right after defendant claimed that he was with Nellie at the time of the murder, Leuzzi assured him that "What you tell us is stayin' in here." About five minutes later, Leuzzi reiterated that "What you say here, stays here with us right now." Defendant argues that these assurances conveyed promises of confidentiality.

¶ 65     Relying on Leuzzi's testimony at the suppression hearing, the State counters that the detective was merely making the more modest promise that, if defendant named the shooter, the detectives would not let "other gang members *** know that he was talking to us."

¶ 66     Maybe. But the detective's intentions or subjective meanings are not the point. "[T]he state of mind of the police is irrelevant to the question of the intelligence and voluntariness of" a *Miranda* waiver, unless that state of mind is made manifest in words or conduct that affect the suspect's understanding of his rights. *Burbine*, 475 U.S. at 423.

¶ 67     For purposes of the *Miranda* rule, "[c]oercion is determined from the perspective of the suspect." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). And *Miranda* stands for nothing if not the view that police deception about a suspect's rights is a form of official (psychological) coercion. Thus, in determining whether a promise of confidentiality was made, "our focus is not on what the detective intended, but rather on what a layperson in [the defendant's] position would have understood those words to mean." *Lee*, 12 A.3d at 1250 (citing *Burbine*, 475 U.S. at 423-24).

¶ 68     Or more precisely, "a "*reasonable* lay person" in defendant's position. (Emphasis added.) *Id.* Taking an "objective" view of the detective's words allows us to provide clear guidance to law enforcement regarding what may, and may not, lawfully be said. See *In re W.C.*, 167 Ill. 2d 307, 334 (1995); *J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011). At the same time, it allows us to guard against frivolous claims based on spurious interpretations thought up, after the fact, in a bid to suppress a lawfully obtained confession.

¶ 69    If, as Leuzzi testified, all he "meant was like if he—if he was to tell us who the shooter was that we were not going to go out and put his information out on the street to other gang members," then he could have just said that to defendant. The 18-year-old gang member he was addressing would have understood exactly what that meant and where the detective was coming from. Instead, he told defendant, without any qualification or explanation, that "What you tell us is stayin' in here," and "What you say here, stays here with us right now."

¶ 70    On their face, Leuzzi's assurances to defendant are no more limited or qualified than any of the following examples, all of which were found to be promises of confidentiality: " 'What we talk about in here is between us,' " " 'it's staying between us, okay?' " (emphases omitted) (*O.D.A.-C.*, 273 A.3d at 417); " 'This is between you and me, bud.' " (*Lee*, 12 A.3d at 1250); " 'it's between you and me' " (*Stanga*, 2000 SD 129, ¶ 10, 617 N.W.2d 486); " 'just you and me,' " " 'ain't nobody saying nothing' " (emphasis omitted) (*Leger*, 400 S.W.3d at 749). That is, it sounds like another unqualified promise that "anything he said would stay in the interrogation room." *Alexander*, 257 So. 3d at 672.

¶ 71    The State argues that Leuzzi's assurances to defendant were "limited," at least the second time around, by his use of the modifier, "right now." Thus: "What you say here, stays here with us right now." In the State's view, this phrase should have made clear that the detective was only offering confidentiality for a time. And from that, defendant apparently should have been able to infer that the time for confidentiality would expire if and when he wound up in court.

¶ 72    The meaning of this phrase is anything but clear. It could mean that *what defendant said right now* would stay here, full stop (as defendant argues). We suppose it could also mean that what defendant said would stay here *for now* (as the State suggests, in so many words). But even on the State's interpretation, we could not reasonably expect anyone—never mind an 18-year-old

with a poor school record facing the pressures of a custodial interrogation—to divine from this phrase a distinction between not "put[ting] his information out on the street" and not using it in court.

¶ 73　What's more, the phrase "right now" peppers Leuzzi's statements throughout the second round of interrogation, when the alleged promises of confidentiality were made. To take a few examples: "right now is the time to be honest," uttered *seconds* before the first alleged promise; "right now you're stuck in a hard place," uttered *seconds* before the second alleged promise; and "you need to look out for yourself and your family right now," uttered a bit later on. There are many more examples throughout later stages of the interrogation, but we will leave it at that.

¶ 74　The recurring phrase "right now" may have been a rhetorical device, perhaps meant to emphasize the gravity of the moment. Or it may just be a mannerism in the detective's speech. Either way, it is unclear what, if anything, it modifies in the sentence at issue, if it was intended to have any substantive meaning at all. The use of this phrase does not change the fact that the assurances offered can reasonably be understood, at least on their face, as promises of confidentiality. And this is true regardless of whether Leuzzi meant them that way.

¶ 75　But we cannot just take the assurances at face value, as if they were uttered in a vacuum. We must also consider the context in which they were made. Take, for example, the superficially (yet strikingly) similar assurance that " 'What is discussed here, stays here,' " offered by the federal agent in *United States v. Santacruz*, No. 1:21-cr-00304-LMM-JEM-1, 2022 WL 4554420, at *3 (N.D. Ga. Sept. 29, 2022).

¶ 76　The context in *Santacruz* clearly showed that the agent was not making a promise of confidentiality. When this assurance was offered, the defendant had already made the inculpatory statements that he later sought to suppress: immediately after he was read his rights, he admitted

ownership of certain guns and pills, and more generally acknowledged playing a "small part" in the larger drug-trafficking operation that the agents were investigating. *Id.*

¶ 77 When the agents began questioning him about the larger operation, he grew reluctant to answer their questions because he feared for his and his family's safety. As he said, " 'You know what happens when you have too much to say,' " so " 'I just want this to stay here ok…?' " *Id.* The agent was responding directly to this fear when he assured the defendant that any information he gave would, as they both put it, "stay here"—meaning "that his cooperation would be kept secret from others in his organization or those who might inform them." *Id.* at *2. The federal district court thus found that he was not "induced to talk by a promise of confidentiality." *Id.*

¶ 78 The State says much the same about our case. Its theory has always been that defendant was reluctant to talk because he feared retaliation from his gang, and that Leuzzi was responding to this fear when he made the limited promises that defendant's statements would "stay[ ] here" and "with us." At the suppression hearing, the State asked Leuzzi, "Had the defendant voiced some concerns or fears about the gang situation involved in this case?" Leuzzi answered "yes."

¶ 79 The correct answer is "no." The video of the interrogation speaks authoritatively to this question. Defendant never said that he feared his gang would retaliate if he cooperated with the police. He did not utter a single word on this topic to the detectives.

¶ 80 It was not until his trial testimony that defendant claimed, out loud, to fear gang retaliation. But that testimony, offered long after the suppression hearing, was no doubt shaped by the urgent need at trial to disavow his confession, to explain why he would have confessed to a crime he did not commit. And thus his refrain that "snitches get stitches," explaining why he was willing to falsely confess. But that testimony is far too entangled with considerations of trial

strategy to provide any reliable insight into the context of the detective's assurances.

¶ 81    Again, Leuzzi may have *presumed* that defendant harbored an unspoken fear of gang retaliation—defendant was, after all, an MLD—and may have intended his statement to refer only to confidentiality as to fellow MLDs. But as we have explained, the detective's subjective thoughts and intentions are not relevant, unless he expressed them verbally to defendant. *Burbine*, 475 U.S. at 423; *Perkins*, 496 U.S. at 296. Unlike in *Santacruz*, there are no fears or concerns voiced by defendant, and no other tangible, observable features of the context, that clearly reveal the assurances to be something other than promises of confidentiality.

¶ 82    Lastly, we are told that the detectives did not consider defendant a suspect until later in the interrogation; during the second round, when the assurances were made, they considered him nothing more than a witness. Even were we to accept that proposition as true, as we have just reiterated, the detectives' subjective beliefs are irrelevant.

¶ 83    Even *telling* someone that he is not considered a suspect (as the detectives did here, in so many words) does not dispel an otherwise reasonable impression, created by police assurances, that any statements he makes will not put him in legal jeopardy. Perhaps few interrogation tactics are more common than the line, "We don't believe you did it; we just think you know who did." And that may well be a lie—but a lie that courts have long tolerated, for its perceived usefulness in getting the suspect to start talking, to make an initial admission of *knowledge* of the crime that will, in due course, prove to be a prelude to an admission of *responsibility* (either because the suspect unwittingly implicate himself as an accountable party, or because his exculpatory story slowly unravels under pressure and culminates in an outright confession). If we allow this tactic to whitewash a promise of confidentiality, we will allow the police to violate *Miranda* at will.

¶ 84    In sum, however the assurances may have been meant, defendant could have reasonably understood them, at the time, as promises of confidentiality. Thus, the dispositive question is whether they induced his confession. We turn to that question next.

¶ 85                                                  F

¶ 86    We are mindful that the burden on this question lies with the State. What's more, it can be very difficult to know, with any measure of certainty, what factors ultimately sway anyone's decision to confess. That uncertainty may be even greater when the suspect, like defendant here, is an adolescent. But that said, after reviewing the interrogation in this particular case, we find it all but impossible to believe that defendant was induced to confess by Leuzzi's assurances.

¶ 87    For starters, defendant did not say anything that manifested his alleged misunderstanding of his *Miranda* rights and the consequences of waiving them. In one recurring pattern in the case law, the *promise* of confidentiality is offered in direct response to the suspect's own *request* for confidentiality: the suspect might ask to speak "off the record," and rather than disabuse him of this confusion, the police feign to agree to his request. See, *e.g.*, *Clark*, 799 S.E.2d at 195-96; *Leger*, 400 S.W.3d at 748-49. In such cases, the suspect's failure to grasp the second *Miranda* warning is evident from his own words; the promise of confidentiality affirms that misunderstanding and is thus responsible for inducing the confession that follows. But this is not such a case.

¶ 88    If defendant ever silently harbored a belief that his statements would not be used against him in a criminal case, that misimpression should have been dispelled by some of the detectives' remarks near the end of the third round of interrogation, shortly after defendant claimed that one Derrick Jones was the shooter (but before he confessed, during the fourth round of interrogation). When defendant first pointed the finger at Jones, the detectives cautioned him that lying about

this "could come back and hurt [him]." As they explained, after they investigate, they "present [their] case to the State's attorney." (Which means, among other things, that they "don't decide who gets locked up.") However Leuzzi's assurances could reasonably have been taken up to this point, defendant would be hard-pressed to claim, from this point forward, that he did not think his statements to the police would be disclosed to the prosecutor for use in a criminal case.

¶ 89    The passage of time and significant change of context further bolsters our conclusion that Leuzzi's assurances did not induce defendant's eventual confession. A confession is more likely to be induced by a promise of confidentiality when it follows "[i]mmediately after" (*O.D.A.-C.*, 273 A.3d at 417) or "[n]ot long after" (*Lee*, 12 A.3d at 1243) the assurance is offered. But here, defendant did not confess shortly after, and certainly not in direct response to, Leuzzi's assurances that his statements would stay "in here" and "with us." About three hours elapsed between these assurances and the confession, with breaks in between.

¶ 90    To be clear, the sheer passage of time is not dispositive. Take a simple hypothetical: the interrogators promise that the suspect's statements will "stay in here" and leave him to stew, alone, in the interrogation room. When they return, say three hours later, he promptly spills the beans. Despite the passage of time, it still appears that the confession was induced by—indeed, offered in direct response to—the promise of confidentiality. The context had not changed at all during the relatively long interval between the promise and the confession.

¶ 91    Not so here. Consider the overall arc of the interrogation. Defendant initially claimed that he was with his family, or with Nellie, when Martinez was shot. In more or less the same breath, Leuzzi offered assurances that defendant's statements would remain "in here" and "with us" and told defendant that other gang members had already put him out "on the street" at the time of the shooting. Granted, defendant changed his story in short order and admitted that he was out and

about. But defendant was still careful to distance himself from the shooting; he claimed that he was down the street, on the next block, and took no part in the gang dispute that led to Martinez getting shot. Given that defendant remained careful not to get himself mingled up in these events at all, much less implicate himself in the actual murder—a deed he pinned on Derrick Jones—we can only conclude that the assurances he was just offered did not in fact mislead him about the consequences of his admissions to the police.

¶ 92    The interrogation took an accusatorial turn when the detectives discovered that Jones was in Cook County Jail at the time of the shooting. This lie was the clincher; the detectives were now firmly convinced of what they no doubt suspected most of the time, if not all along—that defendant was indeed the shooter. And they confronted him with this conclusion immediately upon returning to the room for the fourth round of interrogation: "You shot the guy, didn't you?" By now, the writing was on the wall for defendant. The detectives continually pressed him to admit his guilt, which he did, about 15 minutes later. Given the context in which defendant ultimately confessed, we see no basis for attributing the confession to a supposedly mistaken belief, induced three hours earlier by Leuzzi's assurances, that a confession would carry no legal consequences.

¶ 93    Everything we have said applies equally to Leuzzi's remark, "it's just you and me," and others to this effect. Remarks like these have been deemed improper promises of confidentiality. See, *e.g.*, *Lee*, 12 A.3d at 1250; *Stanga*, 2000 SD 129, ¶ 10, 617 N.W.2d 486; *Leger*, 400 S.W.3d at 749. Even if that is true here, too, these remarks clearly did not induce defendant's confession, for all the reasons we have noted. (And one more: Leuzzi would use this line when Struska left the room—when it was literally just defendant and Struska—but Struska was back in the room when defendant eventually confessed.) So we need not examine the context of these particular

remarks any further. Instead, we end with a general cautionary note: these remarks, like all the others we have examined in this case, run a serious risk of suppression whenever a confession follows them in short order.

¶ 94    In sum, defendant's continued exculpatory lies, coupled with the significant change in the context of the interrogation, lead us to conclude that defendant's confession was not induced by promises of confidentiality.

¶ 95                                        G

¶ 96    We turn now to the three remaining categories of alleged *Miranda* error. The first builds on the theme of promises of confidentiality. Those assurances, defendant says, were not the only statements that undermined the warnings; others similarly implied that he would not be charged if he confessed to shooting Martinez. To this same end, the detectives told him that the truth was "only gonna' help" him, and indeed, it was "the only thing" that would help him.

¶ 97    Modern police interrogation, based as it is on a psychological confidence game rather than the third degree, depends upon the ability of the interrogators to convince the suspect that, in *some sense*, it is in his interest to confess. Threats and promises are off limits; the voluntariness test has long established that. *Miranda* pushed deception about the suspect's fifth amendment rights out of bounds. But as long as they steer clear of these prohibited forms of " ' "official coercion," ' " the police may impose " ' "moral and psychological pressures to confess." ' " *Thompkins*, 560 U.S. at 387 (quoting *Connelly*, 479 U.S. at 170, quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)). And general "exhortation[s] to tell the truth" are among these permissible pressures. *People v. Wipfler*, 68 Ill. 2d 158, 173 (1977).

¶ 98    These exhortations may sometimes have a religious, spiritual, or metaphysical ring to them. See, *e.g.*, *Thompkins*, 560 U.S. at 376, 386; *People v. Bowen*, 87 Ill. App. 3d 221, 226

(1980). They are usually nothing more than an appeal to the suspect to tell the truth, clear his conscience, and relieve himself of the burden of concealing his misdeeds.

¶ 99    Here, for example, woven into the interrogation at various points were remarks from the detectives such as: "Come clean. You're holding it inside, it's hard for you to say it. Let it out." And this: "I can see it in your face. It's real simple. Right now you're stuck in a hard place." And: "I'm telling you it's a weight that's on your chest right now. Once you tell me, it's off." The challenged remarks, to the effect that telling the truth would "help" defendant, were in this vein. They were a permissible form of moral or psychological pressure to admit whatever defendant had to admit, not a misrepresentation about the legal consequences of making a statement to the police.

¶ 100   The same is true of the detectives' various appeals to defendant to look out not only for his own interests (as opposed to lying for another gang member) but also for the interests of his family—to "take care of" his brother and mother in particular. There were myriad remarks to this effect throughout the interrogation, and we will not attempt to quote them at any length. The point is simply that they were another form of moral or psychological pressure—an exhortation for defendant to " 'be a man' " (see *Wipfler*, 68 Ill. 2d at 163-64) in this instance by doing right by his family. The exhortation did not run afoul of *Miranda*.

¶ 101   Defendant's citations in this context provide no meaningful support for his argument. In *United States v. Lall*, 607 F.3d 1277, 1281-82 (11th Cir. 2010), the police responded to an armed robbery and home invasion at a residence that the defendant shared with his parents and siblings. There, they learned from the defendant's brother that he was " 'into credit card fraud and making ID's and stuff with the Internet.' " *Id.* at 1281. Before searching his room and questioning him about those allegations, an officer told the defendant, flat out, "that he was not going to pursue

any charges against him," and that "the purpose of any questioning was to protect [his] family from future harm" by gathering evidence relevant to the "home invasion robbery." *Id.* at 1283-84.

¶ 102   Here, the detectives never told defendant that he would not be charged. And the reference to the defendant's family in *Lall* was not an "emotional appeal" (in defendant's words) similar to anything in this case. It was part of the ploy to deceive Lall into believing that his statements to the police would not be used, as they ultimately were, to charge him with conspiracy to commit credit card fraud, aggravated identity theft, and other related offenses. *Id.* at 1281.

¶ 103   The officer's statement in *Hart v. Attorney General of Florida*, 323 F.3d 884, 888, 894 (11th Cir. 2003), that " 'honesty wouldn't hurt [the defendant]' " might sound, superficially, like the statements at issue here, but the context, and thus the meaning, was different. The statement in *Hart* was made during a "colloquy" that ensued after the defendant asked the officer her opinion "on the pros and cons of hiring a lawyer." *Id.* at 894. That question alone showed that the defendant did not fully understand his right to counsel. *Id.* As to the "cons" of hiring a lawyer, the officer explained, " 'I'm going to want to ask you questions and he's going to tell you you can't answer me.' " *Id.* at 888.

¶ 104   That explanation contradicted the *Miranda* warnings: the point of having counsel present during a custodial interrogation is to protect the suspect's right against self-incrimination, yet the officer explicitly cast that as a disadvantage of having a lawyer. *Id.* at 894. And in the midst of this conversation, the officer told the defendant that " 'honesty wouldn't hurt him.' " *Id.* In context, the implication was that a lawyer would tell him not to answer certain questions even though honest answers would not work against his interests. But of course his answers *would* work against his interests—the very interests that counsel is charged with protecting. Thus, the

*Hart* defendant did not understand that honest self-incriminating statements *could* "hurt him," in precisely the sense that the *Miranda* warnings are meant to convey. Whatever one may think of the *Hart* decision, and the case is not without its critics, its facts are far afield from anything that happened here.

¶ 105   Defendant's second main theme is that the context and presentation of the *Miranda* warnings "diminished" their "import and gravity." By our count, this theme comprises three specific points.

¶ 106   First, when the detectives came into the room, Leuzzi—who knew defendant and his family—struck up a brief "cordial conversation" about how they were all doing. After a few words on the topic were exchanged, Leuzzi said, "my partner just wants to talk to you about some things, okay?" and turned it over to Struska for the *Miranda* warnings.

¶ 107   We will circle back to defendant's general, recurring complaint that Leuzzi leveraged their prior interactions to deceive him (in this context and others) into believing that the detective was his friend, who was there to protect his interests. For the time being, we will focus on the more limited point that these remarks preceded the *Miranda* warnings.

¶ 108   *Miranda* requires the warnings to be administered before any custodial interrogation begins. But not everything that comes out of a detective's mouth in a custodial setting qualifies as an interrogation. Brief introductions, checking on the suspect's basic needs, and anodyne pleasantries—like those offered here and extended to defendant's mother and brother—do not require previous warnings. The statement defendant singles out—"my partner just wants to talk to you about some things, okay?"—did not "diminish[ ] the importance of [his] *Miranda* rights" in any meaningful way. And in general, the detective's brief and benign pre-warning remarks did not manipulate defendant into waiving his rights.

¶ 109   Second, in defendant's view, Struska improperly characterized the warnings "as a matter of procedure" and thus "undermined" their "impact and gravity," when he prefaced them with the remark, "just as we do with everybody, we are going to read you your rights."

¶ 110   What are the *Miranda* warnings, if not a "matter of procedure?" The *Miranda* decision itself called the warnings a "procedure[ ]," and more than once. *Miranda*, 384 U.S. at 467, 483-84, 490; *id.* at 500 (Clark, J., concurring in part and dissenting in part). For good reason: a procedure is "a set of actions that is the official or accepted way of doing something." Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/procedure (last visited May 24, 2023) [https://perma.cc/9MAN-UEP3]. And that is exactly what the *Miranda* decision was establishing.

¶ 111   What defendant presumably means to say is something like this: Struska painted the warnings as an empty ritual, devoid of significance, with the intention or at least the effect of minimizing defendant's consideration of his *Miranda* rights. For example, in *People v. Alfaro*, 386 Ill. App. 3d 271, 305-06 (2008), cited by defendant, we said that an officer "minimized" and "significantly undermined" the "impact" of the warnings by telling the suspect that they were being given " 'just for formality.' " We agree that overtly characterizing the *Miranda* warnings as a mere "formality" is improper. But is that what happened here?

¶ 112   Not quite. To describe something as "just a formality," as the idiom was used in *Alfaro*, is to say that it "has to be done but has no real importance." *Formality*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/formality (last visited May 24, 2023) [https://perma.cc/RAD8-AYCH]. It is just a pointless, perhaps mildly inconvenient, bureaucratic hoop to be jumped through—and then promptly forgotten about. The idiom, undeniably, conveys a sense of disparagement.

¶ 113   Struska did not come right out and disparage the warnings as a "formality"; he said they are given to "everybody." (Presumably he meant everybody who is hauled into an interrogation room.) Why? Struska did not elaborate. If he was out to disparage the warnings, at least he managed to avoid language that made the implication clear. The remark is admittedly ambiguous, and police officers should of course strive to avoid any statements, even ambiguous ones, that potentially bear on a suspect's understanding of his constitutional rights. What's more, there is simply no affirmative reason for the police to make remarks like this in the first place. But it goes too far to say that this statement, whatever exactly it meant, automatically vitiated defendant's waiver.

¶ 114   Struska's statement not only lacked the explicit sense of disparagement that was evident in *Alfaro*; it was also made in a very different context. In *Alfaro*, 386 Ill. App. 3d at 302-04, the statement disparaging the warnings as a mere "formality" was one aspect—and far from the most important aspect—of the "question first, warn later" tactic with which the officers deliberately tried to diminish the efficacy of the *Miranda* warnings. See *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality opinion). (And in *Ross v. State*, 45 So. 3d 403, 429 (Fla. 2010) (*per curiam*), defendant's other citation, the statement at issue was likewise embedded in a broader *Seibert* violation.) It was the *Seibert* violation as a whole, and not the statement about "formality" taken on its own, that rendered the post-warning statement involuntary. See *Alfaro*, 386 Ill. App. 3d at 304-05.

¶ 115   Here, the detectives did not employ the "question first" tactic. They did not Mirandize defendant after they had already obtained a confession, when the warnings were already far less likely to have their intended effect as a result of a deliberate police effort to ensure that they actually *were* an empty ritual or "formality." See *Seibert*, 542 U.S. at 613; *id.* at 621 (Kennedy,

J., concurring in the judgment). Taken together, the absence of a broader *Seibert* violation and the ambiguity in Struska's statement readily distinguish this case from *Alfaro* and leave defendant with an exceedingly thin argument that his *Miranda* waiver was invalid.

¶ 116    Third, after reading defendant his rights, neither detective asked him directly, "Do you want a lawyer?" or "Do you want to talk to me?" By state statute, the police must pose these two questions to a suspect who is less than 18 years old before going on to question him. 705 ILCS 405/5-401.5(a-5)(2)(A)-(B) (West 2020). But even for a juvenile, to whom the statute applies, the failure to ask these questions does not render a custodial statement inadmissible if, all things considered, the statement was made voluntarily. *Id.* § 5-401.5(f). And by its terms, the statute does not apply to defendant at all, who had already turned 18.

¶ 117    One might argue that the failure to pose these questions should nonetheless be a factor is deciding whether defendant's waiver was valid. The thought would be that these questions help the suspect achieve a certain clarity and focus regarding the choices he now confronts, making them a best practice if nothing else—and perhaps all the more so when the suspect, while legally an adult, is in reality an adolescent. But then again, one might wonder if any suspect, and especially an adolescent, might actually find it *harder*, psychologically speaking, to demand an end to the interrogation after he has been prompted to affirmatively declare, out loud and to the police, that he wishes to make a statement.

¶ 118    In any event, no case that we know of has ever found a waiver invalid, and a custodial statement inadmissible, on this basis. What *Miranda* requires from the police is simply a clear statement of the suspect's fifth-amendment rights; after that, the suspect is left to invoke those rights on his own initiative. See *Miranda*, 384 U.S. at 471-73.

¶ 119    In his final theme, defendant claims that Leuzzi exploited their prior interactions "in an

attempt to make [defendant] feel as if they were friends and that [Leuzzi] would look out for him." These efforts began with the "cordial conversation" that Leuzzi initiated even before the warnings and continued throughout the interrogation, as Leuzzi made myriad statements to the effect that they "knew" each other, that they have always been "cool" with each other, that Leuzzi was "more loyal" to defendant (and his family) than his fellow gang members, and that, on account of all this, Leuzzi wanted to "help" defendant.

¶ 120   A pre-existing relationship of trust between an interrogator and the suspect has long been considered a factor that weighs against the voluntariness of a confession. *Wipfler*, 68 Ill. 2d at 173. And that is equally, if not emphatically, true of the voluntariness of a *Miranda* waiver. A key purpose of the warnings is "to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest." *Miranda*, 384 U.S. at 469. Leveraging an established relationship of trust does exactly the opposite and thus threatens to undermine the efficacy of the *Miranda* warnings.

¶ 121   So Leuzzi's efforts to ingratiate himself to defendant are indeed problematic from the perspective of *Miranda*. But for all those efforts, defendant lied to the detectives again and again and again. For the various reasons we have already discussed, it is all but impossible to believe that defendant ever came to think that he could confess to Leuzzi with legal impunity because the two of them were "cool." He confessed only after he found himself painted into a corner by his repeated lies. Leuzzi's tactic may not have been innocent, but it also did not work. Defendant's motion to suppress his confession was properly denied.

¶ 122                                        II

¶ 123   Defendant was sentenced to the statutory minimum of 45 years in prison. The trial court believed it could not impose a below-the-minimum sentence, based on defendant's youth and its

attendant characteristics, since he was 18 years (and 2½ months) old at the time of the murder.

Defendant does not dispute that the eighth amendment's protections for juveniles, as established

by *Miller v. Alabama*, 567 U.S. 460 (2012), come to a hard stop at one's eighteenth birthday.

But, he says, the protections afforded by the proportionate penalties clause of the Illinois

Constitution do not: a young or emerging adult offender may raise an as-applied challenge based

on his youthful characteristics, employing the underlying logic—albeit not the express holding—

of *Miller*.

¶ 124   Defendant contends that the trial court misunderstood this point of state constitutional

law. And for all practical purposes, the error short-circuited his attorney's attempt to raise an as-

applied challenge under the proportionate penalties clause. Defendant thus requests a new

sentencing hearing, at which he can develop his arguments and a factual record on this issue.

¶ 125   Defendant's claim poses two questions. First, as a threshold matter, is the as-applied

challenge he proposes on appeal viable or, as the State contends, would it fail as a matter of law,

even before it is considered on its substantive merits? Second, if the claim is viable, did counsel

try to raise it below, only to be stymied by the trial court's alleged misunderstanding of the law?

¶ 126   As to the first question, we agree with defendant that an as-applied challenge, under the

proportionate penalties clause, would have been viable. Our supreme court has repeatedly

declined to shut the door on claims like his. For example, in *People v. Harris*, 2018 IL 121932,

¶¶ 35, 61, the defendant was 18 years old at the time of his offense, and he was sentenced to a

statutory minimum prison term that amounted to a *de facto* life sentence. Because he was 18, he

could not challenge his sentence under *Miller* and the eighth amendment, but he could file a

postconviction petition raising an as-applied challenge under the proportionate penalties clause.

*Id.* ¶¶ 48, 60-61.

¶ 127    And in *People v. House*, 2021 IL 125124, ¶ 32, the supreme court remanded for second-stage proceedings where a 19-year-old defendant raised an as-applied challenge to a mandatory life sentence under the proportionate penalties clause. See also *People v. Thompson*, 2015 IL 118151, ¶ 44; *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 28 ("In *Harris*, the court opened the door for an offender who was 18 or older to make an as-applied challenge under the proportionate penalties clause."); *People v. Zumot*, 2021 IL App (1st) 191743, ¶ 27 ("The court has thus opened the door to the possibility that a young-adult offender might demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was 'cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community.' ")

¶ 128    Under our supreme court's controlling precedents, defendant's claim clearly does not fail as a matter of law. He was the exact same age as the defendant in *Harris*. Although his sentence was a good deal shorter—45 years versus 76 years—our supreme court has since drawn the line for a *de facto* life sentence at 40 years, so that difference is immaterial. *People v. Buffer*, 2019 IL 122327, ¶ 42. And though the State repeatedly insists that defendant received a "discretionary" sentence, he obviously did not, at least not for the purposes of his claim. What he received, in the State's own words, was "the minimum allowable sentence under the law"—in short, a mandatory minimum. See 730 ILCS 5/5-4.5-20(a), 5-8-1(a)(1)(d)(iii) (West 2012). We should not have to say it in print, but a mandatory minimum sentence that amounts to a *de facto* life sentence is a mandatory (*de facto*) life sentence. The State's frivolous assertions to the contrary merit no further discussion.

¶ 129    In short, the minimum aggregate penalty for a first degree murder committed with a

firearm is a *de facto* life sentence. As applied to an 18-year-old, like defendant, that mandatory minimum sentence, and the statutory scheme that generated it, *might* violate the proportionate penalties clause. Defendant's claim to that effect remains legally viable under *Harris* and *House*. That is not to say that the claim has substantive merit. But properly raised, in the right forum, the claim does demand to be heard.

¶ 130   Which brings us to our next question: did counsel raise, or rather try to raise, this claim below, only to be shut down by the trial court, based on a misunderstanding of the law? A close reading of counsel's sentencing argument reveals that the answer is no.

¶ 131   Counsel began the argument by acknowledging, as the State had previously detailed, that the sentencing range "is 45 years to life." Counsel then called defendant's sister as a mitigation witness; she asked the judge to "give him the minimum" and said nothing in her testimony of any particular relevance to defendant's youth or the *Miller* factors. After her testimony, counsel continued, "what I am asking, what we are asking for, your Honor, is the minimum, Judge."

¶ 132   Counsel went on to cite *Harris* and various United States Supreme Court cases on juvenile sentencing, arguing that "there should be discretion in the court to sentence him." The State objected that this line of argument was irrelevant, but the judge let counsel continue. As counsel explained, "Judge I don't believe there is a fine line," and "I think it is going to change, the policy."

¶ 133   The judge responded, "The Illinois Supreme Court has ruled on this, but certainly there is a bright line," to which counsel responded, "[y]es." In particular, the judge continued, "[t]hat bright line is 18," so "[y]ou can make an argument all you want. Unfortunately the courts have ruled that there is a bright line." Whether or not counsel agreed with that bright line "really is irrelevant at this point in time."

¶ 134   Counsel soldiered on, reiterating that "I don't agree with the bright line," but "I know it is the law." In reality, "18 is a kid," and that reality has been, and continues to be, recognized in other contexts. The Illinois legislature, for example, was debating at the time whether to allow the sale of cannabis, with a cut-off age of 21 rather than 18. Similarly, it was "interesting," in counsel's opinion, that you can join the military or vote at the age of 18, but you cannot get a FOID card or buy a pack of cigarettes.

¶ 135   Counsel then summed up by asking, four times over, for a minimum sentence. First: "But as I go back, Judge, my argument is in light of the circumstances, and I know what the Appellate Court ruled on, I am asking Judge, for the minimum sentence for my client." Soon after that: "Judge, I would ask for the absolute minimum sentence tension [*sic*] that is applied by law. I regret that you don't have discretion. I believe you should have discretion." Again: "I am asking, Judge, for the absolute minimum sentence that the law allows you to bestow upon my client in light of the circumstances and facts surrounding this case." Finally: "I did believe that the evidence that you saw at trial does warrant for the minimum sentence." And with that, counsel concluded the defense's sentencing argument.

¶ 136   Counsel never so much as mentioned the proportionate penalties clause. Nor did counsel ever ask for a sentence below the statutory minimum based on defendant's youthful traits; to the contrary, counsel asked, no fewer than five times, for the minimum sentence allowed by law. Not once did counsel suggest that any provision of law gave the court discretion to impose a sentence below the statutory minimum. Quite the opposite: counsel acknowledged, more than once, that the court had no such discretion. And lastly, counsel never attempted to make a factual record pertaining to the *Miller* factors through the testimony of the one witness called by the defense at the sentencing hearing.

¶ 137   As we read the record, the gist of counsel's argument was not an (attempted) as-applied challenge under the proportionate penalties clause, but rather that the law pertaining to the sentencing of juveniles and young adults is constantly changing and developing, and hence that, in counsel's expectation, the law, the "policy," "is going to change." And the trial court correctly perceived that *this* argument is not one for a trial court—or, for that matter, an intermediate appellate court—to entertain.

¶ 138   In arguing that counsel tried to raise an as-applied challenge, defendant contends on appeal that counsel began to do so, but was "stopped" by the judge, who "did not allow" counsel to finish the argument. Defendant elaborates on this point in his reply brief, where he claims that after the court short-circuited counsel's as-applied challenge, counsel decided not to "continu[e] to argue with the court" and instead "pivoted" to a new argument, namely, that defendant's age "was at least mitigating enough that he should get the minimum sentence."

¶ 139   But counsel asked for a minimum sentence from the very start, before the judge said one word about the defense's argument. So there is no basis for calling this a "pivot[ ]." And even once the judge declared that there is a "bright line" at the eighteenth birthday, counsel was free to make a record of any disagreement about the law that the defense may have had with the court on this point. But counsel never did so, and never asked to do so. Nor did counsel ever seek to make an offer of proof regarding the evidence that the defense would have offered, vis-à-vis the *Miller* factors, had the court allowed the challenge to proceed. Instead, counsel readily agreed with the court that there *is* a bright-line rule, even if there should not be, and even if that "policy" might change as the law on this topic continues to develop over time.

¶ 140   On this record, we cannot agree that counsel tried to mount an as-applied challenge to a statutory minimum sentence under the proportionate penalties clause, only to get cut off the by

court, based on its misunderstanding of the law. True, the court did misunderstand the law, at least in part: the "bright-line rule" to which it referred applies only to the eighth amendment, not to the proportionate penalties clause. But if the trial court misunderstood this point, so too did defense counsel, at least as far as this record shows. The best one can say is that counsel cited *Harris*—an apt citation, to be sure, for the as-applied challenge that defendant now proposes on appeal. But it is far from clear that counsel cited *Harris* for the purpose of raising a constitutional challenge under the proportionate penalties clause. As best we can tell, counsel was just as mistaken as the trial court about what *Harris* establishes.

¶ 141   Because the trial court did not improperly prevent defense counsel from raising an as-applied challenge, defendant is not entitled to a new sentencing hearing. But all is not lost for defendant. As in *Harris*, 2018 IL 121932, ¶ 48, and *House*, 2021 IL 125124, ¶ 32, he can pursue his challenge in a postconviction petition. We express no view here about the substantive merits of any such challenge.

¶ 142                          CONCLUSION

¶ 143   The judgment of the circuit court is affirmed.

¶ 144   Affirmed.

---

### *People v. Leanos*, 2023 IL App (1st) 191079

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-04242; the Hon. Geary W. Kull, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Richard Connor Morley, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Tasha-Marie Kelly, and Koula A. Fournier, Assistant State's Attorneys, of counsel), for the People. |